SOLOMON *v.* STATE.

(*Knoxville*, September Term, 1934.)

Opinion filed November 30, 1934.

PEABODY HOWARD, of Chattanooga, for plaintiff in error.

W. F. BARRY, JR., Assistant Attorney-General, for the State.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Mayer Solomon, referred to herein as the defendant, was convicted for violating section 10898 of the Code, which is as follows:

"Any person who willfully and maliciously causes to be burned, or who aids, counsels or procures the burning of any of the property mentioned in this article, shall be guilty of arson and shall be punished as provided herein for those who are guilty of setting fire to or burning such property themselves."

The maximum punishment of defendant was fixed at four years in the penitentiary.

The defendant is a naturalized Russian Jew, forty-two years of age, and at the date of the offense was operating a grocery store in the city of Chattanooga. He was convicted of voluntary manslaughter in 1927, and given a sentence of two years in the penitentiary. He was pardoned after serving eleven months of this sentence.

For some time prior to May, 1932, defendant's wife owned a house located on Lazard street in the town of East Ridge, Hamilton county. The house was constructed at a cost of $2,100, four years prior to the attempted

burning, was mortgaged for $1,400, and insured for $2,700. Defendant admitted that he had been having difficulty in collecting the rent on this house.

Certain officers had information that an attempt would be made to burn this property. They watched the house during the night of May 7, 1932, the day on which the tenant moved out, but no attempt was made to burn it that night. On the next night the officers went to the place about 10 o'clock, and one of the neighbors told them that some one had come to the premises in a car and had gone into the house. The officers immediately went to the place with the intention of capturing the parties, but, before they had an opportunity to do so, the car was hurriedly backed out of the driveway and an escape attempted. The parties in the car were Joyner and Mann. They were pursued by the officers and Joyner, who was driving, in his haste to get away, failed to make a turn in the street and ran out into a field. He then jumped out of the car and made his escape. He was later arrested and released on bond furnished by defendant, which he forfeited. He has never been apprehended. Mann was discovered secreted in the back of the car, was arrested, carried to jail, and through him the officers learned that the car belonged to defendant and that Joyner was to return it to him at the Y. M. H. A. at 10 o'clock. The officers then went to the Y. M. H. A., arrested defendant, and brought him to the police station, where he admitted ownership of the car, but claimed he had loaned it to Joyner to take a girl riding.

After capturing Mann, the officers returned to the Solomon house, and in the basement found a partially burned burlap bag which had been saturated with coal oil. They put out the fire, which had burned some dis-

tance up the weatherboarding; the damage resulting therefrom being about $100. Mann was not known to the defendant at all.

The state attempted to establish a conspiracy between defendant and Joyner, and then, upon the assumption that a *prima facie* conspiracy had been established, had Mann to testify, over objections of defendant, as to statements made to him by Joyner about burning the house. If such conspiracy was established, then the testimony was competent; otherwise it was not, was highly prejudicial, and the defendant should have a new trial.

Echols, who was a tenant on the property shortly before it burned, testified that on the night of May 2nd some parties came to the house about midnight and set fire to a place near the basement window; that he was awakened and saw their car drive away. This information was imparted to the officers, which accounts for their presence on the premises at the times heretofore stated. Echols further testified that defendant came to the house a few days before he moved out and attempted to get him to move a yard hydrant which was located 10 feet from the house, and which furnished the outdoor water supply.

It is further shown that defendant took Joyner out of the workhouse on March 21, 1932, and paid or secured his fine of $65.70. After Joyner's arrest in this case, defendant paid $40 to a bondsman to make his bond. Joyner has a criminal record. Defendant says he did the things herein enumerated because Joyner had a sister who operated a restaurant and who was one of his best customers.

Mann testified, in effect, that on the night in question Joyner picked him up in defendant's automobile about

7 o'clock, drove to Solomon's store, went inside, and came out a few minutes later with a burlap sack, containing what he later found to be an oil can. Such a sack and oil can were found by the fire marshal at the precise place where the fire started. In view of the foregoing circumstances, we concur with the trial court in holding that a *prima facie* case of conspiracy had been made out, and hence the testimony of Mann as to statements made to him by Joyner were admissible. Mann's testimony is as follows:

"He (Joyner) came to me on Wednesday before the Sunday the house was set on fire and asked me if I would like to make some money and I asked him what, he told me Mr. Solomon offered him $100.00 to burn his house east of the ridge and he offered me $50.00 and asked me if I would help, and I said I didn't know, I didn't like to do anything like that and I went down to the restaurant that afternoon and he talked to me about it and I didn't see him any more until Saturday and he told me Saturday would I go with him Sunday night. I told him I didn't know. I talked to him again Sunday and he told me Solomon was to go to the Y. M. H. A. for some kind of a meeting, and was going to leave the keys in his car and he would come by home after me, and he came by home about seven o'clock, and we went from my house to Mr. Solomon's store where he got the sack with something in it and from there to Lazard Street and Mr. Joyner got out of the car and asked me to hand him the sack and I did and he went on the front porch and it is built so I could not see up there, and in about five minutes he came out the basement window on the opposite side and got in the car and Mr. Avery and Mr. Wakefield fired at us."

The defendant made a complete denial of his complicity in this matter.

Upon the foregoing facts, we think the verdict is abundantly sustained.

With respect to the law of conspiracy, this court, in *Owen* v. *State*, 16 Lea (84 Tenn.), 1, 3, 4, said:

"A conspiracy is, in general terms, a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose: 3 Greenl. Ev., sec. 89.

"When the conspiracy is established, the act or declaration of one conspirator in the prosecution of the common enterprise, is considered the act or declaration of all, and is evidence against all. A foundation, however, must or should be laid to establish a *prima facie* case of conspiracy before the admission of evidence of acts or declarations of one as evidence against all: 1 Whar. Am. Crim. Law, sec. 702; 1 Greenl. Ev., sec. 111.

"But it is within the discretion of the court to permit evidence to be given, the relevancy of which is not apparent at the time, which the prosecution shows will be rendered so thereafter: 3 Greenl. Ev., sec. 92; 1 Greenl. Ev., sec. 111.

"And every one entering into a conspiracy is a party to every act which has before been done by the others, and to every act by the others afterward, in furtherance of the common design: Ibid.

"From the foregoing authorities it appears that all acts and declarations of conspirators, or of any of them, may be given in evidence against all, from the time the conspiracy had its origin until its design has been consummated, or until it is abandoned. When it was entered into is usually established by circumstantial evi-

dence. But the declarations or acts of one cannot be admitted against another, unless the facts and circumstances warrant the conclusion that a conspiracy was existing at the time of such declarations or acts.''

We quote from 12 Corpus Juris, under the title ''Conspiracy,'' as follows:

Section 1. ''It has been said that there is perhaps no crime an exact definition of which it is more difficult to give than the offense of conspiracy; a difficulty resulting in a large measure from the fact that the law on the subject of conspiracy, except where settled by legislative enactment, is, beyond certain limits, in a very uncertain state; the cases beyond such limits, which have been adjudged to be conspiracies, appear, it has been said, 'to stand apart by themselves' and to be 'devoid of that analogy to each other which would render them susceptible of classification.' However, the essentials of a conspiracy, whether viewed with regard to its importance in a criminal prosecution or its significance in a civil action for damages, are commonly described in this general language: It is a combination between two or more persons to do a criminal or an unlawful act or a lawful act by criminal or unlawful means. In other words, to constitute a conspiracy the purpose to be effected by it must be unlawful in its nature or in the means to be employed for its accomplishment. The foregoing definition perhaps is not perfectly accurate, but is sufficient as a general description of the offense. 'The offense thus defined excludes only confederations to accomplish lawful objects by lawful means; the offense includes all possible unlawful confederations.' ''

Section 2. ''A conspiracy to commit a crime is a dif-

ferent offense from the crime that is the object of the conspiracy."

 Section 6. "The mere knowledge, acquiescence, or approval of the act, without cooperation or agreement to cooperate, is not enough to constitute one a party to a conspiracy. There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose."

 Section 7. "No formal agreement between the parties to do the act charged is necessary. It is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument. A mutual implied understanding is sufficient, so far as the combination or confederacy is concerned, to constitute the offense. If two persons pursue by their acts the same object often by the same means, one performing one part of the act and the other another part of the act, so as to complete it with a view to the attaining of the object which they are pursuing, this will be sufficient to constitute a conspiracy. Previous acquaintance is unnecessary, and it is not essential that each conspirator shall take part in every act, or that he shall know the exact part to be performed by the other conspirators in execution of the conspiracy. Conspiracy implies concert of design and not participation in every detail of execution."

Summarizing the facts of this case, we find (1) a motive for the burning on the part of defendant; (2) absence of motive on the part of Joyner otherwise than as the tool of defendant; (3) defendant's effort to have the means of quenching the fire removed; (4) a close re-

lationship established between defendant and Joyner; (5) Joyner's possession of defendant's automobile with his consent; (6) Joyner going to defendant's store, procuring a burlap sack and can of oil, then driving direct to the dwelling and setting fire to it. Applying the principles of law announced herein to the foregoing facts and circumstances, we think a *prima facie* case of conspiracy is made out that makes the statements of Joyner to Mann competent.

It is insisted, however, that the court held to the contrary in *Cavert* v. *State*, 158 Tenn., 531, 14 S. W. (2d), 735, 737. In that case it was said:

"The evidence in this case negatives the idea that there was to be any concerted action by these parties in taking the life of Cassaway. The wife alone was to commit the act.

"If procuring and commanding his wife to commit the crime constituted a conspiracy, then conspiracy and accessory before the fact mean the same thing, and the defendant has been acquitted of that offense.

"There is a distinction, however. One contemplates joint action in the commission of the crime; the other does not."

This statement was inaccurate, because it carries the impression that each of the conspirators has to participate in the final act by which the object of the conspiracy is consummated, which, it will be noted from the authorities quoted above, is not true.

In 16 Corpus Juris, 134, it is said:

"An accessory before the fact is one who was not present, actually or constructively, at the time when a felony was committed, but who counseled, procured, or commanded another to commit it, and he is equally guilty

with the principal. There are several things that must concur in order to justify the conviction of one as an accessory before the fact: (1) That he advised and agreed, or urged the parties or in some way aided them, to commit the offense; (2) that he was not present when the offense was committed; (3) that the principal committed the crime."

■ A conspiracy may be entered into by several parties for the accomplishment of a particular unlawful object; for example, arson, and, when one of the conspirators actually burns the building, the others become accessories before the fact, but until the felony is committed they are not accessories, but conspirators only.

In the Cavert Case, if the husband and wife had confederated together to take the life of Cassaway upon an agreement that the husband was to furnish the pistol and horse and the wife was to do the killing, that would constitute a conspiracy, and, when Mrs. Cavert actually killed Cassaway, her husband would become an accessory before the fact, an offense of which the jury acquitted him, and which offense embraced and included the conspiracy. That case was decided correctly because accused could not be convicted of an offense of which he had been acquitted.

It further appears in the Cavert Case that the state relied upon the testimony of Mrs. Cavert for a conviction, and, according to her testimony there was no conspiracy, but she killed Cassaway through fear of her husband, who stated that he would kill her if she did not obey his command.

■ Error is assigned upon the admission of the following telegram in evidence, over objection of defendant, addressed to Mrs. J. C. Wyatt, sister of Joyner, to-wit:

"Macon, Georgia, May 27, 1932.

"Wire Dugan's address. Have Sol wire ten dollars. Leaving here tonight.

"[Signed] Byron."

Learning of this telegram, the fire marshal had Joyner arrested in Macon, Georgia, the night the telegram was received. Avery testified that Joyner admitted that he sent the telegram. The purpose of introducing the telegram was to show the close relationship between defendant and Joyner. It was cumulative, since that fact had been abundantly established. Even conceding that it was incompetent, in our opinion, it could not have affected the verdict, and is not therefore reversible error. Code, section 10654.

The record presents a strong case against the defendant. Certainly the evidence does not preponderate against the verdict. There is no reversible error on the record, and the judgment of the trial court will be affirmed.