STATE of Tennessee, Appellee,

v.

Jack WISEMAN, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Aug. 20, 1982.

Permission to Appeal Denied by Supreme Court Dec. 6, 1982.

Richard W. Pectol & Associates, P.C., Johnson City, for appellant.

William M. Leech, Jr., Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, Lewis W. May, Jr., Dist. Atty. Gen., Mountain City, William R. Mooney, Lynn Brown, Asst. Dist. Attys. Gen., Johnson City, for appellee.

## OPINION

SCOTT, Judge.

The appellant/defendant, Jack Wiseman, was indicted with Elaine Minor, Connie King, Keith King, Clyde Harris, D.W. Deaderick, Jack Hughes, and Gary Green in a forty-six count indictment for embezzlement of public funds in violation of TCA § 39–4231. Mr. Wiseman, Ms. Minor and Mr. & Mrs. King were named as defendants in all counts of the indictment, and the other defendants were named in some of the various counts. The other defendants' cases were severed, and Mr. Wiseman, Ms. Minor, and Mr. & Mrs. King were tried together at a joint trial. Most of these defendants testified against the ones on trial.

On motion of the state, the trial judge dismissed five counts of the indictment. Following a four week trial, the jury found all of the defendants not guilty on all remaining counts except the last. Under that count the jury found all of the defendants guilty of embezzlement of public funds in the amount of $162,000.00 as charged and fixed the punishment for each one at not less than three nor more than ten years in the state penitentiary, and assessed a fine in the amount of $162,000.00 against each defendant. Only Mr. Wiseman appealed. He has presented six issues, with numerous subissues, for our consideration.

First, he contends that the venire from which the grand and petit juries were selected were so tainted due to improprieties in the selection process as to deprive the appellant of a fair trial and of due process of law. He points to two alleged irregularities. First, he contends that the grand jury was illegally constituted, because the deputy sheriff who received the venire facias was not sworn to keep the names secret; that the original venire facias was not signed, dated, or tested by the clerk or signed by the deputy who received it; and that the venire facias was not returned to the clerk.

The deputy who received the venire testified that he was not sworn to keep the names secret when the venire was delivered to him by the clerk. However, he knew that he was obligated to maintain the secrecy of the list, and further testified that he never revealed the names to any one who was not authorized to participate in the summoning of the veniremen. He testified that he signed for the list when the clerk released it to him.

The deputy clerk testified that the deputy sheriff signed a copy of the venire, but did not sign the original. She asked the deputy to swear to keep the list of prospective jurors secret, but did not have him raise his hand or otherwise formally administer an oath. The deputy responded that he would preserve the secrecy of the list, and she gave him the venire in a sealed envelope. The original venire was dated with the month and year, but not the day of the month. It was not signed by the judge or clerk. The sheriff's department did not make a written return of the original venire.

The appellant did not demonstrate how he was prejudiced by these deviations from the statutory procedures. He presented no proof of fraud.

TCA § 22-2-305(a) provides:

When the venire for any term of criminal court or circuit court shall have been drawn, as heretofore provided, the clerk of the court shall immediately issue the state's writ of venire facias to the sheriff of the county containing the names of the jurors so drawn, leaving off the number of the names and the initials, commanding him to summon said jurors for the term of court for which they were drawn, and he shall swear said sheriff when delivering said writ to keep secret the names of the jurors to be summoned and to caution said jurors when summoned to keep secret the fact that they are jurors until they are called as such in court.

TCA §§ 24-3-101-104 provide the form of the Book oath, oath with uplifted hand, affirmation and oaths in the forms of other countries or particular religious creeds.

However, TCA § 24-3-105 provides that the oath is legally binding in whatever mode administered, unless the form is objected to at the time of the administration.

In *Preston v. State,* 115 Tenn. 343, 90 S.W. 856 (1905), the talesmen were improperly sworn, not having been required to kiss the Holy Bible. The defendant objected after the jurors had been elected and accepted. Although holding that the objection came too late, the Supreme Court noted that the issue was without merit. The Court there stated:

While in such matters it is the duty of the officers to follow the forms prescribed by law, and they should always do so, yet mere formalities are not, in cases of this kind, essential to the validity of the act, and, if there is a substantial compliance with the statute, the oath is obligatory and binding, which is all that is required.

Then quoting from Wharton, *Criminal Law,* § 1251, the Court further noted:

The fact that a person takes an oath in any particular form is a binding admission that he regards it as binding on his conscience, and a mere formal variation from the form of the statutory oath does not affect its obligatory character.

The statement by the deputy that he would keep the venire secret was substantial compliance with the requirement that the officer be sworn. His subsequent actions indicated his recognition that it was binding on his conscience and obligatory on him.

Irregularities in the procedures for the selection, summoning, and impaneling of juries do not affect the validity of the selection of a grand jury in the absence of fraud. TCA § 22-2-313.

In *Flynn v. State,* 203 Tenn. 337, 313 S.W.2d 248, 252-253 (1958), our Supreme Court in discussing de facto grand juries held:

The better rule and that which is supported by reason and authority is that there may be a de facto grand jury and when such a jury acts in the absence of fraud or prejudice or what-not, its actions are good.

.　　.　　.　　.　　.

The statutes regulating the selection of grand juries are enacted for public reasons rather than for the benefit of any individual; they are intended to facilitate the selection of a jury, to equalize the burden of jury service, and to preclude the packing of juries or the selection of jurors with reference to particular matters and causes likely to be submitted to them for determination.

In the absence of any showing of fraud or prejudice, the indictment by the grand jury was valid, even though there was a minor deviation from the statutory procedure for summoning the venire. This aspect of this issue has no merit.

■■■ In the second aspect of this issue the appellant contends that the opening of the jury box by the trial judge and the ex parte discussion of the jury with the District Attorney General tainted the appellant's trial.

About five days before the jury selection began for this trial, the District Attorney General notified the trial judge that the venire list of over 300 potential jurors contained a disproportionate number of names from outside the city of Johnson City, where approximately 50% of the residents of Washington County live. Although there was no reason to suspect impropriety, the trial judge took the jury box into his chambers and checked a sample for proportionate representation. The judge pulled handfuls of names from the top, bottom, back, and front of the box. He examined 352 slips containing names and addresses of veniremen and found 280 were from outside the city, 48 from within the city and 24 that could not be determined from the addresses. Defense counsel were notified and after arguing their positions, the trial judge again checked another sample of 400 slips in the presence of two witnesses, finding 358 from the county and 42 were from the city. Instead of challenging the array of the venire already chosen for this case, counsel chose to challenge the judge for investigating this obvious discrepancy. By opening the box the trial judge was looking at the names and addresses of prospective jurors who would be called in this case only if the venire already drawn was exhausted. Although the jury selection process was protracted, the record does not indicate whether additional names had to be drawn. If they were not, the appellant could not complain about the opening of the box, since he was in no way affected. TCA § 22–2–310 provides that:

> If for any reason the judge of either the circuit court or criminal court at any time discovers that the jury box has not been filled or renewed, or that the jury list has not been prepared or renewed as required by law, or the venire not drawn, or additional names not drawn as required by law on order made by such judge, or if the jury box has been tampered with, said judge shall have the right to investigate said jury box and also the jury list, either at chambers or in open court, and see that this part is duly enforced; and should it be discovered that any irregularities or frauds exist, correct the same.

Under this code section trial judges have supervisory and investigatory powers over the jury box and list. *Buckingham v. State,* 540 S.W.2d 660, 665 (Tenn.Cr.App. 1976).

The appellant contends that it was error for the trial judge to exercise this power after having an ex parte discussion with the District Attorney General. He asserts that the trial judge may open the box only upon motion in open court.

The District Attorney General's ex parte communication with the judge concerned all jury trials before prospective jurors whose names appeared on the list. The record did not show that the appellant's name was even mentioned at this discussion. There is no requirement that a formal motion precede the judge's opening of the box. The statute clearly gives the judge the power to open the box when "for any reason" the judge suspects an irregularity. TCA § 22–2–310.

The appellant further contends that the trial judge's conduct was improper because he did not have the power to open the box

to determine whether the names were inadequately mixed. TCA § 22–2–304(a)(1) provides that the board of jury commissioners shall unlock the box at the appointed time prior to a term of court and "after well shaking the same", have drawn therefrom in their presence and in the presence of the clerk, by a child under ten years of age, the number of names which the presiding judge of the court shall have directed to be drawn. The fact that the venire was not drawn as required by law is one of the irregularities that the trial judge is authorized to investigate. TCA § 22–2–310. The trial judge had the authority to determine whether the box was well-shaken.

TCA § 22–2–302(a)(1) provides that the box will be filled with the names of legally qualified prospective jurors "from each district in the county and in proportion to the population of such districts, as near as may be".

Another of the irregularities which the trial judge is authorized to investigate is "that the jury list has not been prepared or renewed as required by law". The trial judge was clearly empowered by the legislature to open the box to determine whether the districts were proportionately represented in the venire. Neither this aspect of the issue nor the issue generally has any merit.

In another issue the appellant questions whether the trial judge's refusal to grant the appellant's motion for a bill of particulars was an abuse of discretion which deprived him of a fair trial and due process of law. The appellant contends that the indictment was defective in that it did not adequately set forth the specifics of the offense with which he was charged. Instead of pursuing a motion to dismiss the indictment, the appellant, pursuant to Rule 7(c), T.R.Cr.P., sought and received a bill of particulars. The state provided a four page bill detailing the factual allegations it intended to prove. The appellant moved for a second, more detailed bill of particulars, and this motion was denied.

The bill of particulars is a device by which a defendant can be apprised of the precise charges against him. This is the singular purpose of this document. It is not meant to be used for the purpose of broad discovery. Committee Comments to Rule 7, T.R.Cr.P.

The three basic requirements of an indictment are, (1) notice to the defendant of the offense which he is called upon to answer; (2) notice to the court so that a proper judgment can be entered; and (3) protection of the defendant against double jeopardy. *State v. Pearce,* 7 Tenn. (Peck) 66, 67 (1823). The fundamental test of the sufficiency of an indictment is the adequacy of the notice to the defendant conveyed by its terms. *State v. Estes,* 199 Tenn. 406, 412, 287 S.W.2d 40, 42 (1956).

The count of the indictment in this case for which the appellant was convicted charged that:

JACK WISEMAN, ELAINE MINOR, CONNIE KING AND KEITH KING heretofore, to wit, on or about the 1st day of January A.D., 1975, to June 15, 1977, unlawfully and feloniously, acting in concert with each other and in concert with Jack Wiseman, County Chairman of Washington County, Tennessee, did convert to their own use and for other purposes, approximately $162,000.00 in money, the property of Washington County, Tennessee, without authority of law, by overcharging Washington County, Tennessee on the sale of explosives, the said Jack Wiseman being at that time charged with the safekeeping, transfer, and disbursement of said money belonging to Washington County, Tennessee, in violation of Section 39–4231, Tennessee Code Annotated, and against the peace and dignity of the State of Tennessee.

This indictment gave the appellant full and complete notice of the offense with which he was charged. In the bill of particulars the state explained how it intended to prove that the appellant and his co-defendants accomplished these acts. Taken together, the indictment and the bill of particulars were more than adequate to provide the appellant with notice of the of-

fense against which he was required to defend. This issue has no merit.

■ In the next issue the appellant contends that he was prejudiced by the trial judge's denial of his motion to sever. In one aspect of the issue he contends that it was an abuse of discretion to fail to sever his trial from that of his co-defendants. He contended that had the severance been granted that his co-defendants would have testified and that their testimony would have exculpated him. However, the proof in the record revealed that the co-defendants' counsel would not allow them to take the stand at the joint trial, and there is nothing in the record to indicate that they would have done so at the appellant's separate trial.

A motion for severance is addressed to the sound discretion of the trial judge, and the denial of such a motion will not be reversed on appeal unless it appears that the defendant was prejudiced by the court's action. *State v. Coleman,* 619 S.W.2d 112, 116 (Tenn.1981). In *Coleman,* the Court quoted with approval from *Woodruff v. State,* 164 Tenn. 530, 538–539, 51 S.W.2d 843, 845 (1932), as follows:

It may have been to the interest of each [defendant] that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.

Rule 14(c)(2), T.R.Cr.P. recognizes that the court may grant a severance if it is deemed appropriate to "promote a fair determination of the guilt or innocence of one or more defendants".

In this case the state alleged and proved a conspiracy between the four main defendants. All of the proof was relevant to each one. Separate trials would have required total duplication of the voluminous evidence. Separate trials would have placed a tremendous burden on the prosecutors, witnesses, judge, and the taxpayers who pay for the operation of the courts.

The appellant has not demonstrated any prejudice from the joint trial. In the absence of some evidence that the co-defendants would have testified and that their testimony would have been exculpatory, there is nothing in the record to show that the appellant was prejudiced by a joint trial. This aspect of this issue has no merit.

■ The second prong of the appellant's attack upon the denial of the severance is directed at the trial judge's refusal to sever the various counts of the indictment. The appellant contends that he should have had a separate trial on each of the forty-five counts of the indictment. He contends that the "spill-over effect", "guilt by association", and "guilt by accumulation of evidence" required a severance of the counts.

Rule 14(b)(2), T.R.Cr.P. provides for severance of offenses if it is deemed appropriate to "promote a fair determination of the defendant's guilt or innocence of each offense". The issue of severance or joinder of offenses is also a matter which is addressed to the sound discretion of the trial judge. In *State ex rel Gann v. Henderson,* 221 Tenn. 209, 425 S.W.2d 616, 618 (1968), our Supreme Court, quoting 23 C.J.S. (Criminal Law) § 931, set forth the rules for consolidation or severance as follows:

Ordinarily consolidation for trial or refusal to order a severance or separate trial is permissible or proper where the offenses charged are similar, related, or connected, or are of the same or similar character or class, or involve or arose out of the same or related or connected acts, occurrences, transactions, series of events, or chain of circumstances, or are based on acts or transactions constituting parts of a common scheme or plan, or are of the same patterns and committed in the same manner, or where there is a common element of substantial importance in this commission, or where the same, or much the

same, required in their prosecution, and if not joined for trial the repetition or reproduction of substantially the same testimony will be required on each trial.

In this case the offenses were alleged to have been committed as part of a conspiracy to defraud Washington County. Much of the evidence concerning the methods used to defraud the county was admissible as to each count. The fact that the appellant was convicted of only one count under an indictment alleging a multitude of offenses is convincing evidence that there was no prejudice from the joinder of offenses. There was no abuse of discretion in refusing to sever the counts in the indictment. There is no merit to this aspect of this issue or to the issue generally.

In the next issue the appellant contends that the cumulative effect of improper evidence, conduct, and instructions denied him due process of law. Under this issue the appellant has pointed to seven alleged errors that he contends tainted the trial.

First, he contends that the trial judge erred by having ex parte communications with the prosecutors out of the presence of the jury (sic). (Actually counsel argues the actions were outside the presence of the appellant and his counsel.) In this issue he seeks to again present an issue concerning the investigation of possible problems with the venire, which were called to the judge's attention by the District Attorney General. As heretofore set forth, this allegation is totally devoid of merit.

In the next subissue the appellant contends that the trial judge erred by commenting on the evidence and accrediting a witness for the state.

During the cross-examination of a prosecution witness, Gerald McCord, defense counsel attempted to establish that, in exchange for his testimony, a deal had been struck between the state and Mr. McCord. One of their key assertions was that Mr. McCord had been indicted but never arraigned. The trial judge stated that he thought Mr. McCord was arraigned on February 2, 1980. After much haggling over whether the witness had in fact been arraigned, the trial judge stated:

Let me put something in the record. He was here and was arraigned on February the 2nd, 1980.

Following this statement, defense counsel asked that the jury be excused and called two deputy court clerks as witnesses to attempt to establish that Mr. McCord had not been arraigned as the trial judge had stated. During the jury out hearing, counsel strenuously contended that by making this statement the court had commented on the evidence. When the jury returned the trial judge gave the following admonition:

Ladies and gentlemen of the jury, just before you were sent out, I made ___ an an effort to save some time, I made a statement that this witness was arraigned on February the 2nd, 1980, and I ask that you disregard this statement that I made. You should not consider this in any way whatsoever in determining the guilt or innocence of any of these Defendants.

The appellant has failed to show how this relatively minor incident in a trial which lasted four weeks affected the verdict. The jury is presumed to have heard and followed the trial judge's instruction to disregard his earlier statement. *Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34, 42 (1964). In view of the admonition, the statement was, at most, harmless error. Rule 52(a), T.R. Cr.P. This aspect of this issue has no merit.

In the next aspect of this issue the appellant contends that the court erred in allowing unqualified opinion testimony and opinion testimony based on speculation. The testimony of three witnesses is attacked.

David Leidy, Manager of Distribution for Atlas Powder Company, testified as to the amount of rock that should have been produced by an explosion and its estimated cost per ton. The appellant objected to this opinion evidence, since the witness had never visited the quarries in Washington County, was not familiar with the rock in those quarries and did not know what shot patterns had been used for the explosion.

However, the proof showed that Mr. Leidy had approximately sixteen years experience in the explosives business and had a thorough knowledge of all Atlas products, their costs, and the manner of their usage. From his experience in selling explosives all over the United States, he was able to testify that depending on the hardness of the rock and other conditions, explosives for a quarry should cost between eight and thirty-five cents per ton of rock produced. Using industry rules of thumb, he testified that the amount of explosives used in a big shot in Washington County in 1976 should have produced about 115,000 to 120,000 tons of rock. Based upon the amount of explosives allegedly used, he was able to mathematically calculate that the explosives for this shot cost the county sixty cents per ton of rock produced. This is the kind of information which is frequently calculated and provided to customers by salesmen in the explosives industry. These calculations were within Mr. Leidy's range of experience, and he expressed the limitations on his calculations, pointing out the variations and conditions which could affect the figures. He was thoroughly cross-examined on every aspect of his testimony.

Richard Wampler, a Technical Representative for Atlas Powder Company, was allowed to testify as to the amount of dynamite used in the big shot in August 1976. According to the appellant, he could not be sure how many loads of explosives he saw, how many holes were drilled for the explosives, or what the specific shot pattern was.

Mr. Wampler, with thirty-four years experience with Atlas, was even more qualified to testify about the August 1976 big shot. He was present and helped with that shot. He remembered that ten holes into which the explosives would have been placed were unuseable because they had fallen in. He was able to estimate that 134 holes averaging 95 feet deep were drilled and filled with explosives. Testifying from facts known throughout the industry and from his own memory, he stated that about 980 pounds of explosives were used in each hole, making a total of approximately 131,-320 pounds used for the shot. He remembered having seen three truck loads of explosives delivered to the site.

The appellant also complains about the testimony of Charles Steagall, a certified public accountant, who was in charge of the annual audit of Washington County. Defense counsel stipulated to his expertise and cannot now be heard to complain that he was not an expert.

As a general proposition the ordinary witness may testify only about facts about which he has first-hand knowledge, and avoid stating mere personal opinions. Paine, *Tennessee Law of Evidence,* § 168, p. 186, citing *Cumberland Telegraph & Telephone Co. v. Dooley,* 110 Tenn. 104, 72 S.W. 457, 458 (1903).

An expert witness, however, may state opinions to the jury. One who has specialized knowledge, skill, or experience can qualify as an expert. Paine, *Tennessee Law of Evidence,* § 174, p. 190. The difficult distinction is between opinion and fact. *Id.,* at § 168, p. 186.

The decision whether to admit or exclude expert testimony is within the sound discretion of the trial judge, and his decision will not be disturbed on appeal unless it has been arbitrarily exercised. *Baggett v. State,* 220 Tenn. 592, 421 S.W.2d 629, 632 (1967). All of these expert witnesses were unquestionably qualified to state their opinions, and the trial judge did not err in allowing the jury to hear their testimony. This aspect of this issue has no merit.

In the next aspect of this issue the appellant contends that the trial judge erred in permitting the introduction of hearsay testimony against the appellant. There were two instances about which the appellant complains. First, he complains about a statement by Mrs. King to Mr. McCord concerning who paid for the appellant's trips to Las Vegas and other points of interest.

The state contends that this was a declaration of one co-conspirator or accomplice in

the prosecution of the criminal enterprise, considered the act of all co-conspirators, and therefore admissible as evidence against all. *Randolph v. State,* 570 S.W.2d 869, 871 (Tenn.Cr.App.1978).

 The appellant, citing *United States v. Cruz,* 536 F.2d 1264, 1267 (9th Cir.1976), admits that otherwise inadmissible declarations of co-conspirators can be admitted into evidence when three conditions are met. These conditions are: (1) the declaration was made in furtherance of the conspiracy; (2) it was made during the pendency of the conspiracy; and (3) there is independent proof of the existence of the conspiracy and the connection of the declarant and the defendant to it. The state alleges and the appellant agrees that a prerequisite to the admission of such a statement is the establishment of a prima facie case of conspiracy. It is left to the trial judge's discretion to permit the evidence to be given at any time pending a later showing of admissibility. *Owens v. State,* 84 Tenn. (16 Lea) 1, 3–4 (1885); *Solomon v. State,* 168 Tenn. 180, 76 S.W.2d 331, 333 (1934). However, the appellant contends that there is no proof of the existence of a conspiracy.

However, there was overwhelming independent evidence of the existence of a conspiracy and the appellant's participation therein. His unusual accounting practices, his untruthful and evasive behavior concerning the subject of bidding on explosives, his chumminess with his co-defendants, and the fact that the gross overcharging of the county could hardly have occurred without his assistance all point to the appellant's participation in the conspiracy. The trial judge correctly held that Mrs. King's statement was admissible against the appellant. This aspect of the issue has no merit.

 In the next aspect of the issue, the appellant complains because the trial judge allowed Larry Bailey, an auditor employed by the State of Tennessee, to utilize a chart which he prepared and which summarized his findings based on the voluminous business records which had been introduced into evidence. The appellant contends that this chart was hearsay and inadmissible. He further contends that the chart is not admissible under the Uniform Business Records as Evidence Act, TCA § 24–7–111, et seq.

Actually the chart was a common form of demonstrative evidence. It was prepared by the witness as a summary of his findings from his audit. The use of demonstrative evidence has long been recognized in Tennessee. *Mayor, Etc. of City of Jackson v. Pool,* 91 Tenn. 448, 19 S.W. 324, 326 (1892), *Hughes v. State,* 126 Tenn. 40, 148 S.W. 543, 549–550 (1912). By statute counsel is allowed in civil suits to use demonstrative evidence in argument without its being introduced in evidence. TCA § 20–9–303. Written statements, including charts, which are summaries of voluminous records which are in evidence, admissible in evidence, or available to the adverse party, even though prepared exclusively for use at trial are admissible to aid the jury in understanding matters of finance or statistics. 32 C.J.S. (Evidence) § 698, pp. 958–960.

When the documents introduced in evidence are voluminous and of such a character as to render it difficult for the jury to comprehend material facts without abstracts thereof, it is within the discretion of the trial judge to admit the abstracts provided they are based on facts in evidence, verified by the testimony of the preparer, and provided the adverse party is allowed to examine them to test their correctness by cross-examination. *Public Operating Corporation v. Weingart,* 257 App.Div. 379, 13 N.Y.S.2d 182, 185 (1939).

All of these conditions were met and the trial judge did not abuse his discretion in allowing the witness to utilize the chart to illuminate his testimony. This aspect of this issue has no merit.

 In the next aspect of the issue the appellant contends that the trial judge erred in allowing the state to subvert his right to confront and cross-examine the witnesses against him.

The incident giving rise to the appellant's complaint occurred during the examination of Bobbye Webb. Ms. Webb testified extensively on direct examination. Prior to her cross-examination the trial judge allowed the state to withdraw her from the stand and to put on two out of state witnesses who needed to get home for the weekend. After these witnesses presented their testimony, the examination of Ms. Webb continued, and she was thoroughly cross-examined by defense counsel on every aspect of her testimony.

The trial judge is the individual who is ultimately responsible for every aspect of the orchestration of the trial. *State v. McCray*, 614 S.W.2d 90, 93 (Tenn.Cr.App. 1981). One common problem frequently encountered in trials, particularly lengthy trials, is the necessity to interrupt one witness' testimony in order to allow another witness to testify out of order. The trial judge has discretion to allow this to be done, for he is vested with authority to determine the order in which witnesses may be examined and the time at which the examination will occur. 98 C.J.S. (Witnesses) § 317, p. 12. In the absence of a showing of prejudice from the trial judge's exercise of this discretion, his decision to allow the interruption of a witness' testimony will not be disturbed on appeal. This aspect of this issue has no merit.

In the next aspect of this issue the appellant contends that the trial judge erred in permitting witnesses with whom the state had made deals to testify, since the state had given a negative response to the appellant's motion inquiring as to the existence of any deals.

Prior to trial the defense counsel sought revelation by the state of all deals with witnesses who would be called to testify. The state responded that no deals had been made. The appellant contends that Gerald McCord and Gary Green had been offered leniency in exchange for their testimony. Although each witness was thoroughly cross-examined regarding having made a deal, no evidence was revealed that any agreement had been consummated with these witnesses in exchange for their testimony. In view of this proof, there was nothing for the state to reveal. This aspect of this issue has no merit.

■ Next the appellant contends that the trial judge erred by refusing to admit the appellant's statement. The appellant attempted to place before the jury, through a T.B.I. agent, a statement that the appellant gave to the Tennessee Bureau of Investigation. In the statement the appellant admitted his friendship with his co-defendants, but adamantly denied his guilt of embezzlement. The state objected to the admission of his statement on the basis that it was hearsay and self-serving. The trial judge sustained the state's objection.

In *Moon v. State*, 146 Tenn. 319, 242 S.W. 39, 54 (1921), the Supreme Court considered this issue and held that the self-serving declarations of a criminal defendant are not admissible. In *Hall v. State*, 552 S.W.2d 417, 418 (Tenn.Cr.App.1977), this Court, citing *Wharton's Criminal Evidence*, 13th Edition, § 303, explained the reasoning for this rule as follows:

> A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense. A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

The appellant's exculpatory statement was properly excluded. This aspect of the issue has no merit.

■ In the final aspect of this issue, the appellant contends that the trial judge erred by giving confusing and misleading jury instructions. First, he contends that the trial judge misquoted TCA § 39–4231. As part of the judge's charge, he defined embezzlement of public money or property. He then charged concerning the elements of the offense as follows:

For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt that (1) one of the Defendants was charged with the collection, safekeeping, transfer or disbursement of money belonging to Washington County; (2), that Defendant used any part of said money in any manner without authority of law or converted any part to his own use; (3) that Defendant did so with intent to appropriate the subject money to his own use; and (4), the money was over the value of two hundred dollars ($200.00).

This instruction was taken from T.P.I.— Crim. § 28.10, where the instruction is as follows:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt that:

(1) the defendant was charged with the collection, safekeeping, transfer, or disbursement of money belonging to Washington County;

(2) the defendant used any part of said money in any manner, without authority of law, or converted any part to his own use;

(3) the defendant did so with intent to appropriate the subject money to his own use; and

(4) the money was over the value of two hundred dollars ($200.00).

The appellant's argument revolves around the trial judge's use of the word "that" instead of the word "the" in elements two and three of the offense. The appellant contends that because he was the only public official on trial that the charge suggested that he had to be convicted before his co-defendants could be. He contends that this confusion was evidenced by the fact that the jury returned shortly after retiring and questioned whether the co-defendants could be convicted on any count without the appellant being convicted on that count. In response to their question, the trial judge instructed them to read the charge.

In response to this allegation, the state points out the fact that before getting to the consideration of the elements of the offense, the trial judge fully instructed the jury concerning the fact that each defendant's charges should be separately considered. In this regard the trial judge charged the jury as follows:

You should give separate consideration to each Defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular Defendant should not be considered by you as to any other Defendant. You can acquit all or convict all, or you can acquit one or more and convict the others. If you cannot agree upon a verdict as to all the Defendants but do agree upon a verdict as to one or more of them, you must render a verdict as to the one or more upon which you do agree. In many instances in the following charges in referring to the Defendant, the pronoun "he" appears. I instruct you that since two of the Defendants are females in these cases, the pronoun he also means she. Also, some of the charge uses the word defendant, singular. I charge you that since there are four Defendants, you are to consider it in the plural.

There was no error in the giving of this aspect of the charge. The jury was fully instructed to consider each defendant individually. It is presumed that the jury followed the judge's instructions. *State v. Barton,* 626 S.W.2d 296, 298 (Tenn.Cr.App. 1981). This aspect of the issue has no merit.

■ The appellant further complains that the trial judge improperly omitted important portions of TCA § 39–4233. This code section provides as follows:

The refusal or willful neglect of any public or private officer, clerk, agent, or other person mentioned in §§ 39–4231, 39–4232, to pay over the money or other property so placed in his care or custody, upon demand therefor by the proper person or authority entitled to receive the

368

same, or as required by law, or the selling, mortgaging or pledging of any such property, or the withdrawing, loaning or depositing of any such moneys, by such officer or other person for his own profit or advantage, without express authority, shall in each case be prima facie evidence of the embezzlement thereof.

From this statute the trial judge charged only the following:

The withdrawing, loaning or depositing of any monies by such person for his own profit or advantage without express authority shall in each case be prima facie evidence of the embezzlement thereof.

There is no evidence in this case to indicate that the first portion of this statute was applicable to this case. Hence, there was no error in failing to charge the entire statute. This aspect of this issue has no merit.

In his final attack upon the charge, the appellant contends that the trial judge improperly charged the jury concerning a statute which the appellant was not charged with violating. In support of this contention he simply referred to the portion of his brief challenging the sufficiency of the evidence. The only criminal statute cited in that portion of his brief was TCA § 39–4231. This is precisely the statute that the appellant is charged with having violated and was the statute about which the trial judge charged the jury. This aspect of the issue has no merit.

All of the subissues attacking the trial judge's evidentiary rulings and instructions are without merit, and the entire issue has no merit.

This was a protracted trial in which the state, this appellant, and his co-defendants were all represented by extremely competent counsel who, in their efforts to advance the positions of their respective clients, often became contentious, cantankerous, and insulting to one another and the court. Due to this appellant's position as the chief executive officer of the state's sixth largest county, the trial attracted wide attention from the media and the public. However, the trial judge conducted an exemplary trial under difficult and trying circumstances.

In the next issue the appellant challenges the sufficiency of the convicting evidence. The appellant was the County Judge of Washington County. His co-defendants are the owners of Bellamy Explosives Company, Inc. and Blountville Drill Supply Company.

Washington County operated five rock quarries from which gravel was produced for use on the county roads. Explosives were used to extract the rock and drill bits were used on the jackhammers with which the holes for the explosives were drilled.

The county was divided into four blocks with a foreman over each block. Clyde Harris, who was also named in the indictment with the appellant and his co-defendants, was the foreman of one block for eleven years. Mr. Harris, who was illiterate, testified that in a month's time he rarely used and never received more than 200 drill bits, which were packaged fifty to the box. Generally, he received two to three boxes per month with four being the most ever received. He never received a thousand drill bits in a month, but acknowledged his signature on delivery tickets from Blountville Drill Supply for as many as 1,500 at one time. Mr. Harris testified that the explosives were ordered by the appellant's office and that when he needed explosives he would tell the appellant to order them.

In August 1976, there was a big shot at one of his quarries. A large quantity of explosives were used. This shot produced so much rock that it took three years to use up the rock produced by this single blast.

Mr. Harris admitted that, from time to time, he would find a little money in his coat pocket. This would be $5.00, $10.00, $20.00 or $100.00. One Christmas he was given a knife by Bellamy Explosives. After the August 1976 big shot, Mrs. King had been sitting in his truck. When she got out, he discovered $1,000.00 stuck under the edge of the seat where she had been sitting.

Robert Owens was a quarry foreman for the Washington County Highway Department. He signed delivery tickets when his boss wasn't there. The most drill bits that Mr. Owens ever received at one time was also 200, but acknowledged his signature on several invoices for 1,000 drill bits.

Joe Ratliff worked at two different quarries operated by the Washington County Highway Department and signed for supplies delivered by Blountville Drill Supply. Although he testified that he never signed for 1,000 drill bits, he acknowledged his signature on two tickets each for that amount. He also remembered having signed for fourteen small cases of explosives, but the delivery ticket showed that a total of 2,000 pounds was delivered.

James Rush was also a block foreman for the Washington County Highway Department who signed delivery tickets for drill bits that he never received.

Leonard Gray, a quarry foreman, testified that he signed for two cases of explosives delivered by Bellamy one day at quitting time, but identified his signature on delivery tickets for either 3,900 or 4,900 pounds of dynamite (the figures were illegible on one delivery ticket).

Gary Dale Green, also indicted in this case, testified that he was the Road Superintendent for Washington County, and that prior to that he was a road commissioner, having two quarries in his district. He identified a delivery ticket for 1,000 steel bits signed by him, but testified that he never received a thousand at once, the most he ever received having been 500.

Shortly after his November 1976 election as Superintendent, Mr. Green asked the appellant about the possibility of getting bids on the explosives used in the quarries. The appellant told him that he had negotiated with Bellamy Explosives and that the price they had quoted was the best possible price. Mr. Green asked the appellant if the county was being overcharged, and the appellant replied that he did not think so.

Mr. Green admitted receiving money from Mrs. Minor and Mrs. King when they delivered supplies. The first time any money was passed to him was at the courthouse when Mrs. King slipped $30.00 into his pocket. Mrs. King and Mrs. Minor also approached him about giving him a 10% kickback on their total sales to the county. He agreed. Over a period of time they kicked between $1,500.00 and $2,000.00 back to him. In addition, they also gave him a pocket calculator, ceramic birds, and crates of oranges at Christmas.

Ron Hillman is married to Gigi Bellamy, who is the sister of Mrs. King and Mrs. Minor. Mr. Hillman worked at both Blountville Drill Supply and Bellamy Explosives and made deliveries to Washington County. He explained the various procedures for the delivery of explosives and supplies. There was a white, yellow, and pink copy of each delivery ticket. The pink copy was left with the delivery. The deliveryman returned the white and yellow copies to the company. When the invoices were sent, the yellow copy was attached thereto, and the white copy was kept as the company record. The prices were filled in at the office after the deliveries were made.

Mr. Hillman testified that their business is located on Big Hollow Road off the Airport Road, and that a competitor, Austin Powder Company, is located two miles away. Austin had a sign on Big Hollow Road and the competitor's sign was introduced as an exhibit.

Mr. Hillman testified that the only brand of explosives they sold were those manufactured by Atlas Powder Company, and they obtained their drill bits from Brunner and Lay.

M.M. Freeman, Office Manager and Purchasing Agent for Brunner and Lay of Ashville, North Carolina, testified that from 1975 through 1977, Blountville Drill Supply bought a small number of drill bits from his company, but nowhere near the number that were charged to Washington County.

Bobbye Webb is the bookkeeper in the Washington County Executive's Office, (formerly the County Judge's Office) having been hired by the appellant in 1974. Her duties included the keeping of the

books for the various funds of the county. Their procedures included the submission of the bills for approval by the Purchasing Committee of the County Commission, (nicknamed the Watchdog Committee). The committee approval was stamped on each invoice which was initialed or signed by a member of the committee. Most were signed by Jasper H. Friday, whose nickname was "Blue". Mr. Friday served on the committee throughout the period covered by the indictment and never missed a meeting.

Ms. Webb testified that in order to get a discount for early payment, the appellant authorized the payment of some bills that were received after the committee held its monthly meeting. However, neither Bellamy Explosives nor Blountville Drill Supply offered a discount. Hence, there was no reason to pay either of these suppliers early. On the mornings when the committee met, the block foremen would sometimes meet with the appellant and review their bills. The appellant looked over all of the county's bills every month, but they had no procedure for checking delivery tickets against the invoices. After the warrants were written, the appellant personally signed each one.

Mainly two funds were involved in these matters, the General Fund and the Highway Upkeep Fund. There were line items for various accounts within each fund, and each bill was posted to the appropriate account. "Explosives" were a separate line item and drill bits were posted to "Material and Supplies". The largest explosives bill Ms. Webb ever remembered was $20,000.00 to $30,000.00.

For the July 1, 1976, through June 30, 1977, fiscal year, the County Commission appropriated $100,000.00 for explosives. The November 10, 1976 statement showed that by that date $83,556.88 had already been spent for explosives, leaving a balance available under that line item of $16,443.12. The December 1976 report showed that $102,891.88 had already been spent for explosives, overspending that line item by $2,891.88. However, the following month,

without any amendment of the budget by the County Commission, the report showed that the county was now $31,000.00 under budget in the Explosives line item.

According to Ms. Webb, the appellant told her to charge two warrants for explosives to Material and Supplies. On another occasion a bill in the amount of $51,234.23 was received from Bellamy Explosives and paid. Upon the appellant's instructions, $30,000.00 of this amount was charged to Capital Outlay, with the balance being charged to the Explosives account.

On a couple of occasions the appellant would pull out the warrants written to Bellamy Explosives and Blountville Drill Supply and personally deliver them to Mrs. Minor or Mr. & Mrs. King, since he stated that he would see them over the weekend.

Ms. Webb testified that explosives were put out for bid one time before 1974, the year the appellant took office, but not afterward. Other items, costing much less than the explosives, such as automobiles, were put out for bid. There was no bidding list. Rather, to obtain bidders, firms were picked from the telephone book. The appellant decided which firms would be interested in bidding.

It was not unusual for expenditures for a particular item to exceed the budget, but it was the County Commission which would amend the budget when the account was getting low. The procedure required Ms. Webb to notify the appellant when an account was low. He then reported this to the Commission, which amended the budget by resolution.

On August 27, 1976, Bellamy Explosives allegedly delivered explosives for which the county was billed $73,862.36. For some unknown reason this shipment was billed on three separate invoices which were sent over a period of four months.

In addition to his willingness to personally deliver the checks to Bellamy Explosives, the appellant was quite friendly with the owners of the business, meeting with them frequently in his office. On one occasion, Ms. Webb accompanied Mr. & Mrs. King

and the appellant and Mrs. Wiseman on a trip to an Alabama race track in the Kings' recreational vehicle. Ms. Webb also knew that the appellant accompanied the co-defendant to Nassau, Hawaii, and Las Vegas.

Don Rains, the Advertising Manager for WJCW and WQUT Radio, organized the trip to Nassau in 1975, and the trip to Las Vegas in 1976. On the Nassau trip the appellant wrote his own check for $400.00 for himself and his wife. The Kings and Mrs. Minor and her husband also went on that trip. Strangely, all of these couples gave their addresses as "c/o Jack Wiseman, Route 8, Johnson City, Tennessee".

On the Las Vegas junket the appellant also participated, sitting with Mr. King on the airplane. There was one check from Bellamy Explosives in the amount of $1,650.00 which was tendered for the payment for three couples, presumably including the appellant. Mr. Rains had no record that the appellant had paid for his and his wife's trip.

Two representatives of the Atlas Powder Company testified. Jim Martin, Marketing Coordinator for the company headquartered in Dallas, Texas, testified that Bellamy Explosives was a distributor for their products. All products were delivered on consignment to the distributor, or directly to the customer. The distributor received a 10% commission on its sales. Because explosives are, by their nature, extremely dangerous commodities, the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department requires a daily inventory of all consigned stock. Extremely detailed records are kept by Atlas and the distributor's records and their records are reconciled for each transaction. Hence, his company is able to determine to whom the products are shipped, even when shipped from the distributor's stock. The inventory that each distributor has on hand on any given day is also recorded by Atlas. Discrepancies between the amounts available for sale and the amounts allegedly sold appeared.

Mr. Martin testified that he had discovered that Bellamy charged Washington County considerably more for explosives than were its other customers. For example, Pellite was marked up 300%.

James David Leidy, the District Manager for Atlas Powder Company, unaware that his distributor was overcharging Washington County, testified concerning the amount of explosives sold by his company to Bellamy Explosives. He testified that the big shot in August 1976 consisted of two or three truck loads of explosives. Each truck load weighed 40,000 pounds. However, Bellamy's records revealed that on August 27, 1976, 168,750 pounds were shipped to Washington County. Bellamy Explosives' office had not received sufficient explosives to make up the difference in what his company shipped and the amount allegedly sold to the county.

Charles Steagall, a Certified Public Accountant, whose qualifications were stipulated, prepared the county audits and quarterly reports and helped the county in its bookkeeping. He testified that the payment for explosives from other accounts and the transfer of money between line items without the approval of the Budget Committee of the County Commission were very unusual actions. He was not consulted about these transfers and noted that under no circumstances would explosives be mistaken for Material and Supplies or Capital Outlay items, since Explosives was a separate line item in the budget.

He noted another splitting of invoices for a May 1976 delivery into three invoices. Invoices totaling $39,140.09 were paid for explosives allegedly delivered on May 6, 1976. However, the invoices were dated May 6, 1976, July 6, 1976, and August 6, 1976. The largest was for $20,338.52 and was sent in August. In addition to being unusual, this billing procedure resulted in the last two invoices being paid by appropriations for the next fiscal year.

Mr. Steagall noted that the amount of money spent for explosives was great and inquired of the appellant about it. The appellant replied that Bellamy Explosives was the only supplier of explosives in the area. At the request of some of the mem-

bers of the County Commission, Mr. Steagall inquired of the appellant about the trips that he took with the Kings, since this activity appeared to be improper. The appellant insisted that he paid his own way.

Gerald McCord, a salesman for Atlas Powder Company, was also indicted for embezzlement from Washington County. He testified that even though he was violating company policy by so doing, he accepted cash gifts from Bellamy Explosives. Mrs. King told him that when they were on their trips with the appellant and his wife that Bellamy Explosives "picked up the tab".

Mr. McCord remembered that he was present at a meeting with the appellant and Mrs. King. Mrs. King told the appellant that he needed to arrange another big shot at one of the county's quarries so they could go on another trip. The appellant's response was only a smile.

Mrs. King told Mr. McCord that Ed McNew of Austin Powder Company had visited the appellant two or three times to solicit the county's business and to ask the county to accept bids on explosives. His company wanted to bid. Mrs. King assured Mr. McCord that they had nothing to worry about since "Jack Wiseman is not going to let them do it".

Mr. McCord once told the appellant that the explosives in the county's quarries should cost between thirteen and eighteen cents per ton of rock produced and certainly no more than twenty-five cents under the worst conditions. After this meeting Mrs. King ordered Mr. McCord to never discuss prices with anyone else.

After the big shot in August of 1976, the Kings asked Mr. McCord to report that 4,800 more pounds of explosives were used than actually were. He did so in his blast report.

Richard Wampler, a Technical Representative for Atlas Powder Company, assisted in loading the August 1976 big shot. From memory of the shot and some documentation, he calculated that 131,320 pounds of explosives should have been used, although the county was actually billed for 168,750

pounds. The county paid over fifty-nine cents per ton of rock for the explosives allegedly utilized in this blast.

Ed McNew testified that he was the Sales Representative for Austin Powder Company. His magazines and office are on the same road as Bellamy Explosives and were identified by a sign located on the road. His employer advertised in the Yellow Pages of the telephone books in Bristol, Kingsport, and Johnson City.

In the middle 1970's, Mr. McNew called on the appellant to solicit the county's business and determine when the county would be bidding on explosives. The appellant told him that the county had a contract with another firm. He telephoned the appellant three or four more times to solicit the county's business, but to no avail.

He noted that the price of ammonium nitrate, which is used in the blasting process, charged by his company was $9.50 per 100 pounds in 1976, compared to $26.45 charged to the county by Bellamy Explosives.

In addition to Mr. Friday, George Jaynes and George Davis testified that they were on the Purchasing Committee of the County Commission and that they reviewed the county invoices. However, they realized that all of the invoices that were paid were not actually reviewed by the committee. Transfers between line items and other amendments to the budget were accomplished only by the full Commission on recommendation of the Budget Committee.

Mr. Davis testified that he questioned the amount of explosives being used by the county and that he and Mr. Jaynes went to a quarry one time to see what was happening. When they saw the large amount of rock there they were satisfied and did not further question the amounts the county was paying for explosives.

Larry Bailey, an Audit Supervisor for the State Comptroller's Office, testified that it was a routine audit of Washington County which revealed the discrepancies leading to a complete audit and the indictments in this case. Based upon the audit, he concluded

that the county was overbilled $147,323.48 for explosives that could not have been delivered. In addition, if the high mark-up on explosives actually delivered was reduced to the normal mark-up, the amount of money taken from the county would far exceed the $162,000.00 alleged in the indictment.

Neither the appellant nor his co-defendants offered any proof.

Based upon this proof, the jury found the appellant and his co-defendants not guilty of all of the counts in the indictment alleging embezzlement growing out of the drill bit transactions, and guilty of the single count charging embezzlement via the explosives transactions.

 A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

 The proof in this case against the appellant consisted, as it frequently does in embezzlement cases, almost exclusively of circumstantial evidence. Like most smart embezzlers, the appellant never told any witness that he was embezzling from the county. However, it is well settled that a conviction may be supported solely by circumstantial evidence. *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456–457 (1958). The evidence must be consistent with guilt and inconsistent with innocence and must exclude every other reasonable hypothesis except the hypothesis of guilt. The evidence must establish a certainty of guilt as to convince the mind beyond a reasonable doubt that the accused committed the crime. The weight to be given to circumstantial evidence is for the jury to determine. The inferences to be drawn from the evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Williams v. State,* 520 S.W.2d 371, 374 (Tenn.Cr.App. 1974).

 Evidence of any act or declaration of a conspirator during the conspiracy, and in furtherance of it, is admissible as substantive evidence against any co-conspirator on trial for the commission of the target crime. The act or declaration of one conspirator or accomplice in the prosecution of the criminal enterprise is considered the act of all and is evidence against all. *Randolph v. State,* 570 S.W.2d 869, 871 (Tenn. Cr.App.1978), citing *Solomon v. State,* supra.

 As a subissue, the appellant contends that the proof was insufficient to show that he was charged with collecting, safekeeping, transferring, or disbursing money or property belonging to the county, as set forth in TCA § 39–4231. As county judge he was the chief executive officer of the county. TCA § 5–6–106. He was the accounting officer and the general agent of the county. TCA § 5–6–108. His duties included the power to draw all warrants upon the county treasury. TCA § 5–6–108(5). However, the county executive can issue warrants only when the county commission has appropriated money for their payment, in accordance with the applicable statutes. *State v. True,* 116 Tenn. 294, 95 S.W. 1028, 1033 (1895). Thus, according to his argument, he had no authority and virtually no means to use and convert county funds. Furthermore, he contends that a warrant is neither money nor property within the meaning of the embezzlement statute.

However, a county warrant is a written order upon the Trustee of the county to pay a specified sum of money. *Macon County v. Dixon,* 20 Tenn.App. 425, 100 S.W.2d 5, 8 (1936). The County Trustee is required to pay the warrants upon demand if there are funds in the treasury. If not, they are to be paid in numerical order when funds become available. TCA § 8–11–104(5). His refusal to pay a warrant when requested is a misdemeanor. TCA § 8–11–105. Hence,

it is the County Executive who performs the discretionary act of paying the county's bills by withdrawing funds from the treasury. The warrants are the equivalent of money in the same way that checks are the equivalent of money.

As the drawer of the warrants, the appellant was charged with the safekeeping, transferring, and disbursement of the county's funds. This subissue has no merit.

■ He further contends that there was no proof that he used any part of the money without authority of law. While there was no direct proof that he put the money into his pocket, there was proof that he obtained these funds for his friends with whom he vacationed and cavorted on various junkets to various vacation spas. There clearly was circumstantial evidence of his conversion of the money to his own use.

■ Finally, as a subissue he contends that there was a variance between the indictment and the proof. He contends that there was no proof that he overcharged the county and fraudulently converted funds belonging to the county.

The indictment alleged that the appellant and his co-defendants "acting in concert with each other and in concert with Jack Wiseman, County Chairman of Washington County" committed the offense. While the overcharges were obviously on bills that were prepared by the co-defendants or at their direction, the appellant participated in these acts by directing payment of the bills from the county treasury. This issue has no merit.

Considering this case in light of these well established principles of appellate review, it is clear that there was ample evidence to justify any rational trier of fact in finding the appellant guilty beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979).

All issues addressed to the sufficiency of the evidence are without merit.

■ Finally, the appellant contends that the trial judge abused his discretion by denying probation.

The decision to grant or deny probation rests within the sound discretion of the trial judge, who must consider the circumstances of the offense, the applicant's social history, criminal record, present condition, including mental and physical condition, and the deterrent effect upon other criminal activity. TCA sec. 40–2901(a)(1), *Stiller v. State,* 516 S.W.2d 617, 620 (Tenn.1974).

The applicant does not have a demandable right to relief. *Hooper v. State,* 201 Tenn. 156, 297 S.W.2d 78, 81 (1956). The burden is on the applicant to prove that he is entitled to the preferment, privilege, and grace of a probated sentence. *Frazier v. State,* 556 S.W.2d 239, 241 (Tenn.Cr.App. 1977).

For an appellate court to find that a trial judge has abused his discretion in denying probation, it must find that the record contains no substantial evidence supporting the judge's conclusion, giving due consideration to the criteria set forth in the statute and the decisions of our Supreme Court. *State v. Grear,* 568 S.W.2d 285, 286 (Tenn.1978).

In denying probation the trial judge cited two criteria, the circumstances of the offense and the deterrent effect on other criminal activity.

A decision to deny probation may be based on only one appropriate factor. *Powers v. State,* 577 S.W.2d 684, 685 (Tenn.Cr. App.1978). Probation may be denied upon the ground of deterrence alone. *Ball v. State,* 604 S.W.2d 65, 66 (Tenn.Cr.App. 1979). Probation may be denied on the basis of the circumstance of the offense alone, so long as those circumstances would be described as especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. In that case the nature of the offense as committed must outweigh all of the other *Stiller* and statutory factors which might be favorable to a grant of probation. *State v. Travis,* 622 S.W.2d 529, 534 (Tenn.1981).

In *Woodson v. State,* 608 S.W.2d 591, 594 (Tenn.Cr.App.1980), this Court held that the

trial judge can consider the fact that the probation applicant is a public official who has sworn to uphold the law. By committing a crime, the public official has violated his oath of office and thereby breached the public trust.

The appellant sought and was elected to the highest public office in Washington County. He took the oath of office to uphold the law and then violated the deep public trust conferred upon him by the voters of his county who elected him. This was a grossly reprehensible violation of the public trust. The circumstances of the offense, standing alone, were sufficient to justify the denial of probation. Hopefully, the appellant and others will be deterred by his service of his sentence in the penitentiary.

There was ample, indeed overwhelming, evidence to justify the trial judge's decision to deny probation. This issue has no merit.

Finding all of the issues devoid of merit, the judgment is affirmed.

O'BRIEN and CORNELIUS, JJ., concur.