# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

**MARCH SESSION, 1997**



**FILED**

November 12, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9509-CR-00290** |
| Appellee, | ) | |
| | ) | **DAVIDSON COUNTY** |
| **V.** | ) | |
| | ) | **HON. SETH NORMAN, JUDGE** |
| **MICHAEL LYNN WALTON,** | ) | |
| Appellant. | ) | **(RAPE AND OFFICIAL MISCONDUCT)** |

FOR THE APPELLANT:

**LIONEL R. BARRETT, JR.**
Attorney at Law
Washington Square Two, Ste. 417
222 Second Avenue North
Nashville, TN 37201

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**MICHAEL J. FAHEY, II**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243

**VICTOR S. JOHNSON, III**
District Attorney General

**JOHN ZIMMERMAN**
Assistant District Attorney General

**KIMBERLY L. HATTAWAY-HAAS**
Assistant District Attorney General
Washington Square Two, Suite 500
222 Second Avenue North
Nashville, TN 37201

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Michael Lynn Walton, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. He was convicted of two counts of official misconduct in one trial and two counts of rape in another trial. Both trials were jury trials in the Criminal Court of Davidson County. He was sentenced to one (1) year on each of the official misconduct convictions and eight (8) years on one rape conviction and nine (9) years on the other rape conviction. These sentences were ordered to run concurrently which left the Defendant with an effective sentence of nine (9) years. The Defendant argues three issues in this appeal: (1) whether the evidence was insufficient to support the convictions for rape; (2) whether the trial court erred in denying the Defendant's motion for an instruction as to statutory rape as a lesser included offense; and (3) whether the trial court erred in denying probation as to the counts of official misconduct. We affirm the judgment of the trial court.

I.

The Defendant's first issue is whether the evidence was sufficient to support the verdict of the jury for the Defendant's conviction for rape. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and

value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

In his first trial, the Defendant was convicted of two counts of official misconduct and there was a mistrial on the rape charges. At a second trial, the Defendant was convicted of the two counts of rape. The proof in that trial is as follows.

The Defendant was a police officer with the Metropolitan Nashville Davidson County Police Department. We will refer to the minor victim in this case by his initials, J.C., rather than by his full name. In July of 1992, thirteen-year-old J.C. ran away from his home in Kentucky and came to Nashville. He made his way to Riverfront Park in the downtown area of Nashville. The first

evening J.C. was at Riverfront Park the Defendant approached him. The Defendant was dressed in his police uniform even though he was off-duty. He led J.C. to his personal car and drove him to his home in the Bellevue area. On the way to Bellevue, the Defendant stopped at McDonald's and got the victim something to eat. When they arrived at the Defendant's home they ordered pizza. J.C. took a shower and was given clothes by the Defendant. The Defendant then took a shower and was dressed in only a towel. He told the victim he could sleep in the master bedroom, and the Defendant would sleep on the couch downstairs. The victim went to sleep and awoke to the Defendant rubbing the victim's penis. The Defendant then physically held J.C. down while he proceeded to engage in fellatio and then anal intercourse. The boy struggled, but was unable to get away from the Defendant. The Defendant then went downstairs, and J.C. went to sleep. Early the next morning the telephone rang, and J.C. answered the phone. He then handed it to the Defendant. Alberta Harris testified that she called the Defendant's house sometime after 6:30 a.m., but before 12:30 p.m., July 27, 1992. She stated that a young male answered the phone. She asked to speak with the Defendant, and the Defendant then came to the phone. The Defendant dropped the victim off at Riverfront Park later that morning and told him he would be back after he got off his shift at 11:00 p.m.

J.C. was still in the Riverfront Park area when the Defendant's shift was over. The Defendant told J.C. that he was going to take him to Juvenile Detention, however, the Defendant again drove the victim to his house. The Defendant again held J.C. down and proceeded to engage in fellatio and anal intercourse. J.C. then went to sleep. At some point during the evening, Jeff

White came to visit the Defendant. The Defendant told J.C. to hide in the closet. He heard the Defendant and the other man discuss swapping police radios and an upcoming party. The male visitor testified at trial that he and the Defendant did indeed discuss a police radio and getting together that weekend. The next morning, the Defendant dropped J.C. off at Vanderbilt University. The victim spent most of the day there and then walked to Riverfront Park.

That evening the victim came into contact with two men from Murfreesboro who were downtown to enjoy the nightlife. The victim told them several stories as to why he was in that area at that time of night. He persuaded the two men to drive him out to Bellevue to find the Defendant's apartment and they ultimately became frustrated with the boy. The men decided to take him to the police in downtown Nashville. The first officer they encountered at the station yelled at J.C. when he said that he was not a runaway, told the men to leave him in Riverfront Park, and said that if he was a runaway the officer would pick him up later. However, the two men did not want to leave J.C. alone in Riverfront Park. The men then described bad things that could happen to a child left on his own in the world. J.C. began to cry and agreed to be taken to the police station.

The men took J.C. to the Criminal Justice Building. There they received help from Officer Nicolas Marino who, at the time of the incident, worked in the Warrants Division. J.C. was brought into the building, and he was crying. The officer attempted to find out whether J.C. was a runaway. Officer Marino gave J.C. something to eat and drink. He asked J.C. what his name was and J.C. gave him a false name. While J.C. told Officer Marino a false story, another

officer, Officer Waggoner, called Kentucky and discovered J.C. was a runaway, was thirteen years old, and had stolen a car. They confronted J.C. with this information and then took him over to the Juvenile facilities. At this point J.C. told the officers that he had been staying with a policeman while he had been in Nashville. One of the officers stated that he did not think an officer would take him to his house as the department policy was to take runaways to the Juvenile facility. J.C. told them that the man with whom he had been staying had a badge, uniforms in his closet, a police radio, and a patch that read Davidson County Metro Police. The victim told the officers that the policeman he had stayed with for a couple of nights was named Mike, but that he could not remember his last name. Officer Waggoner asked the victim if the policeman did anything to him, and J.C. indicated that the officer had engaged in fellatio with him. J.C. gave a physical description of "Mike" to Officer Waggoner.

Officer Miller was called to meet the other officers and J.C. at the Juvenile facility. Officer Miller was to continue the investigation into the victim's assertions. At the time of the incident, Officer Miller worked in the Personal Crimes Homicide Division. He received information from J.C. concerning the perpetrator being a Metro police officer, a general description of the area where he was taken and a physical description of the officer. He was also told that the officer's name was Mike, but that the victim did not know the officer's last name. J.C. also gave Officer Miller a description of the officer's car. Officer Miller did not recognize the officer as described by J.C.. At this time, the victim also described what had happened to him while he was with Mike.

Officer Miller then had the victim take him to the officer's condominium. They also called uniformed officers who were working in the area, and they were able to locate the condominium. The victim gave Miller a detailed description of the residence. When they arrived at the condominium, the vehicle that the victim had described was parked in front of the building. Sergeant Smith stayed in the car with the victim, while Officer Miller and one of the uniformed officers, Officer Chestnut, went to the front door. Another uniformed officer went to the back door. The Defendant came to the front door, and Officer Chestnut recognized him as a Metro Police Officer. The officers identified themselves and told the Defendant about the allegation. The Sergeant and the victim had a clear view of the Defendant's door and the Sergeant waved to Officer Miller to indicate that the victim had recognized the Defendant as the officer who had taken him home. The Defendant gave the officers consent to search the residence. Officer Miller asked if there had been any thefts or break-ins at the residence, and the Defendant indicated that there had not. The Defendant and Officer Miller then walked through the house. Officer Miller told the Defendant that he wanted to make sure nothing had been damaged, but the real reason was that Officer Miller was attempting to verify the victim's description of the residence. The victim's description was accurate.

J.C. was then brought to confront the Defendant. When he was brought to the Defendant, Defendant turned pale and started shaking. J.C. was wearing the Defendant's clothes at the time. The Defendant denied that he knew the victim, but did acknowledge that J.C. was wearing his clothes. However, the Defendant stated that he did not know how the victim got his clothes. J.C. then made an identification of the Defendant. The Defendant told the victim that he

was crazy. The officers then called the Sexual Abuse Division and evidence was gathered at the Defendant's residence.

The victim's fingerprints were found inside the Defendant's residence on a bottle of cologne and inside the Defendant's vehicle on the passenger's side. A pair of exercise shorts and a t-shirt which were found in the Defendant's hamper were sent to be tested for body fluids. The lab was unable to test the t-shirt. Many stains were on the shorts. The victim and the Defendant would have had distinguishable semen, but not distinguishable saliva. A semen stain that could have been from the victim was found on the shorts. There was also a saliva stain, which could have been from either the victim or the Defendant. A golf shirt and a pair of jeans that the victim was wearing when taken to the Defendant's residence by the other officers were also sent to the lab. A trace amount of semen stain was found on the golf shirt. There was no testimony regarding the origin of this stain.

The Defendant testified at trial. His version of the facts is as follows. He denied that he raped the victim. When Alberta Harris called, Defendant claimed his friend, Darryl Witkowski, answered the phone. Mr. Witkowski was in his early twenties at the time of the incident. He was staying at the Defendant's residence because he was working on his car at the Defendant's house. The Defendant was not aware that his shorts were in the hamper, but knew that they were his shorts. The Defendant had just moved in his condominium and his parents and Mr. Witkowski also had access to his residence. Mr. Witkowski did not have a key, but the front door knob could be turned in such a way as to get in the house. Mr. Witkowski knew how to get in the residence in this manner.

Mr. Witkowski would also use the Defendant's car when he had the Defendant's permission to do so. The Defendant stated that Witkowski looked like him. He was the same height and size and also had a receding hairline.

The Defendant acknowledged that the victim had on his clothes when he was confronted by the other officers. The Defendant denied that he took the victim to his condominium or that the victim was ever in the condominium at the same time he was there. The Defendant had no answers as to how the victim could describe his condominium, how the semen stains were on his shorts, or how the victim knew of the conversation between the Defendant and Jeff White.

We conclude that there is sufficient evidence for a rational trier of fact to find the Defendant guilty of rape. The Defendant argues that the conviction cannot be supported based on the element of force or coercion because the victim returned to the Defendant's home a second night. The evidence set out at trial shows that the Defendant physically held the victim down both nights while perpetrating sexual acts on him. There is sufficient evidence to convict the Defendant of rape.

This issue is without merit.

II.

The Defendant's second issue is that the trial court erred in not instructing the jury on statutory rape as a lesser included offense of rape. The offense of rape, of which the Defendant was convicted, is the "unlawful sexual

penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act. . . ." Tenn. Code Ann. § 39-13-503.  Statutory rape is defined as "sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim." Tenn. Code Ann. § 39-13-506(a).

This court held in State v. Woodcock, 922 S.W.2d 904 (Tenn. Crim. App. 1995), that statutory rape is not a lesser included offense of rape.  This court stated:

> "[A]n offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser." Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979). It is clear that the offense of statutory rape includes an age element whereas the offense of rape does not, and the offense of rape includes the element of force whereas the offense of statutory rape does not. Thus, statutory rape is not a lesser included offense of rape . . . .

Woodcock, 922 S.W.2d at 913.

We agree with this analysis.  Statutory rape is not a lesser included offense of rape.  Neither is statutory rape a "lesser grade" offense of rape.  This court recently observed in State v. Michael Lynn Ealey, C.C.A. No. 03C01-9609-CR-00333, Greene County (Tenn. Crim. App., Knoxville, June 17, 1997) (no Rule 11 application filed), that statutory rape is not a lesser grade offense of the offense of rape of a child.  Our court stated that even though statutory rape is included in the same Part of Tennessee Code Annotated as sexual assault

crimes, which includes rape, this does not ipso facto make statutory rape a lesser

grade or offense of a sexual assault crime.  Specifically, our court stated:

> Moreover, the very nature of the statutory rape offense is fundamentally different from the sexual assault crimes.  For instance, the sexual assault crimes all require some form of "unlawful" contact between the accused and the victim; statutory rape does not. The age of the defendant is irrelevant with respect to all of the sexual assault crimes; it is a crucial element of statutory rape.  All of the sexual assault crimes contemplate the lack of effective consent by the victim; statutory rape contemplates circumstances in which the sexual relations are admittedly consensual.  In short, neither [State v. Trusty, 919 S.W.2d 305 (Tenn. 1996)] nor the statutory scheme nor a consideration of the nature of statutory rape convinces us that it is a lesser grade or class of the rape of a child offense charged in this case.

Ealey, slip op. at 9.

We agree with the analysis in Ealey and hold that statutory rape is

not a lesser grade or class of the offense of rape charged in this case.

Therefore, this issue is without merit.

III.

The Defendant's third issue is that the trial court erred in denying

probation as to the counts of official misconduct.  A defendant who "is an

especially mitigated or standard offender convicted of a Class C, D, or E felony

is presumed to be a favorable candidate for alternative sentencing options in the

absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).  Our

sentencing law also provides that "convicted felons committing the most severe

offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentences involving incarceration." Tenn. Code Ann. § 40-35-102(5). Thus, a defendant sentenced to eight years or less who is not an offender for whom incarceration is a priority is presumed eligible for alternative sentencing unless sufficient evidence rebuts the presumption. However, the act does not provide that all offenders who meet the criteria are entitled to such relief; rather, it requires that sentencing issues be determined by the facts and circumstances presented in each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2) - (4). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the sentence alternative. Tenn. Code Ann. § 40-35-103(5).

When imposing a sentence of total confinement, our Criminal Sentencing Reform Act mandates the trial court to base its decision on the considerations set forth in Tennessee Code Annotated section 40-35-103. These considerations which militate against alternative sentencing include: the need to protect society by restraining a defendant having a long history of criminal conduct, whether confinement is particularly appropriate to effectively deter others likely to commit a similar offense, the need to avoid depreciating the seriousness of the offense, and the need to order confinement in cases in which

less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1) (A) - (C).

In determining whether to grant probation, the judge must consider the nature and circumstances of the offense, the defendant's criminal record, his background and social history, his present condition, including his physical and mental condition, the deterrent effect on other criminal activity, and the likelihood that probation is in the best interests of both the public and the defendant. Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974). The burden is on the Defendant to show that the sentence he received is improper and that he is entitled to probation. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant's total sentence for his combined convictions is nine (9) years. However, the Defendant's convictions for official misconduct may still be considered for probation. If a Defendant's multiple conviction sentence structure exceeds eight years, the individual convictions can still be considered for probation if they fall within the probation eligibility criteria. Tenn. Code Ann. § 40-35-303(a), Sentencing Commission Comments; State v. Langston, 708 S.W.2d 830, 832-33 (Tenn. 1986).

The Defendant's convictions for official misconduct are Class E felonies. He was sentenced to one year for each count as a Range I Standard Offender. There is a presumption that the Defendant is eligible for probation as to his official misconduct convictions. However, the trial court denied his request for probation on these counts.

We agree with the trial court that the Defendant should not be granted probation for his official misconduct convictions. The Defendant does have an excellent work history and social history. He has never been convicted of another crime. However, we must emphasize the seriousness of this crime. The Defendant, a police officer, while in uniform, picked up a young male runaway and took him back to his house and raped him. A police officer is an official who people should be able to turn to without hesitation or fear for their personal safety in times of trouble. The circumstances of an offense may be an appropriate factor for the denial of probation. State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982). We conclude that the circumstances of this offense support the denial of probation.

We also note that the Defendant's conviction for rape where he was sentenced to eight years would be eligible for probation. However, the Defendant does not appeal on these grounds. We conclude that even if he had appealed on this issue he would be unsuccessful for the reasons stated above, and because a breach of trust may be the basis for the denial of probation. Woodson v. State, 608 S.W.2d 591 (Tenn. Crim. App. 1980).

Therefore, this issue is without merit.

We affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JOSEPH M. TIPTON, Judge


_____
 JOE G. RILEY, Judge