IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2002 Session

## STATE OF TENNESSEE v. TRACY LARENZO GOODWIN, ALIAS LAWANDA CARTER

**Appeal from the Criminal Court for Hamilton County**
**Nos. 228289, 228290, 228291, & 228292     Stephen Bevil, Judge**

### No. E2001-01978-CCA-R3-CD
### June 9, 2003

A Hamilton County Criminal Court jury convicted the defendant, Tracy Larenzo Goodwin, of two counts of reckless aggravated assault, a Class D felony; one count of reckless endangerment, a Class E felony; and one count of criminally negligent homicide, a Class E felony. The trial court sentenced him as a Range III, persistent offender to concurrent sentences of twelve years in the Department of Correction (DOC) for the reckless aggravated assault convictions. For the reckless endangerment and criminally negligent homicide convictions, the defendant received six-year sentences to be served concurrently to each other but consecutively to the reckless aggravated assault sentences for an effective sentence of eighteen years. The defendant appeals, claiming (1) that the evidence is insufficient to support the convictions; (2) that the trial court erred by denying his motion to sever the aggravated assault offenses from the reckless endangerment and criminally negligent homicide offenses; (3) that his convictions for reckless endangerment and criminally negligent homicide violate protections against double jeopardy; and (4) that his sentences are excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

A. Christian Lanier, III, Chattanooga, Tennessee, and Johnny D. Houston, Jr., Chattanooga, Tennessee (at trial), for the appellant, Tracy Larenzo Goodwin.

Paul G. Summers, Attorney General and Reporter; Dana M. Ausbrooks, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's pointing a shotgun at Danny Jones and Andrea Jackson on May 15, 1999, and the shooting of nine-year-old Desiree Davis and her cousin, Erica Tucker, on May 28, 1999. Danny Jones testified that on May 15, 1999, he lived with his sister, Andrea Jackson, at 908 Gillespie Road in Chattanooga and that he was working on a car in the driveway. He said that Ms. Jackson was working in the yard and that his nieces and nephews also were in the yard. He said that a car pulled up and that the defendant got out and walked to Ms. Jackson. He said that he heard the defendant arguing with Ms. Jackson and that he said to the defendant, "You can't be coming up in her yard disrespecting her like that." He said that the defendant claimed to own a puppy in the yard and that the defendant said he had ownership papers for the puppy. He said that he told the defendant to bring him the papers and that he would give the puppy to the defendant. He said the defendant left and returned about thirty minutes later with a shotgun wrapped in a white towel. He said that the gun had duct tape on it and that the defendant "kind of" pointed it at him. The state showed Mr. Jones a short-barrel shotgun, and he identified it as the gun the defendant was carrying on May 15.

Mr. Jones testified that he talked to the defendant, calmed him down, grabbed the gun, and unloaded it. He said that the defendant and Ms. Jackson started arguing again, that the defendant became angry, and that he gave the gun back to the defendant, telling him to leave. He said that the defendant pulled a shotgun shell out of a pocket and started to reload the gun but that he took the shell away from the defendant. He said that the defendant pulled out a second shell and that he knocked the shell out of the defendant's hand. He said the defendant started to leave but took a third shell out of his pocket and reloaded the gun. He said the defendant went back into the yard, pointed the gun at Ms. Jackson, and said, "I'll blow your f****** heads off, I'll shoot you and your damn dog." He said that the police arrived and that the defendant ran between two houses. He said that he had never seen the defendant before May 15 and that he gave the shotgun shells to the police. He acknowledged that he was familiar with shotguns and said the gun was cocked and loaded. He said that he is a paraplegic and confined to a wheelchair and that he thought the defendant was going to shoot him and Ms. Jackson.

On cross-examination, Mr. Jones testified that when the defendant first arrived on May 15, the defendant walked up to Mr. Jones's dog, Felony, and that Felony tried to bite the defendant. He said that Ms. Jackson walked over to Felony in order to keep Felony from attacking the defendant. He said that he had had a couple of beers and that the defendant looked like he had been drinking. He said that about one week after the incident, the defendant returned and talked to Mr. Jones's nephew. He said that he did not know what the defendant said to his nephew and that the defendant did not bring the gun with him. He acknowledged having a prior conviction for attempting to sell cocaine.

Andrea Jackson testified that on May 15, 1999, she was mowing her lawn and Mr. Jones was in his wheelchair in the street. She said her children and some of her neighbors' children were sitting on her car. She said that about 5:00 p.m., a car pulled up to the house. She said that a woman was driving and that the defendant got out and walked into the yard. She said that she did not know the defendant, that he claimed to own a puppy in the yard, and that he told her, "I want my damn dog."

She said the puppy was barking and growling at the defendant and that the puppy belonged to her aunt's son. She said Mr. Jones called the defendant to the street and started talking to him. She said that she did not hear their conversation but that the defendant walked back into the yard and said he was going to take the puppy. She said Mr. Jones's dog Felony and the puppy were trying to get to the defendant. She said that the defendant claimed to have ownership papers for the puppy and that Mr. Jones told the defendant to bring him the papers. She said the defendant stated, "Yeah, man, I'll go get the papers, but when I come back, it ain't going to be right." She said that about one and one-half hours later, the defendant returned with a gun wrapped in a towel. She said that the defendant told Mr. Jones he wanted the puppy and that she telephoned 9-1-1. She said Mr. Jones refused to give the puppy to the defendant because the defendant did not bring the ownership papers. She said that the defendant called her a bitch, that she offered to fight the defendant, and that the defendant said he would shoot her.

Ms. Jackson testified that Mr. Jones jerked the gun away from the defendant and started taking the shells out of it. She said the defendant grabbed the gun and reloaded it. She said that she was standing next to Felony and that the defendant pointed the gun at her and the dog. She said that Officer Stephen York arrived and that the defendant ran around the house. She said that about one week later, the defendant returned and talked to the puppy's real owner. She said he did not have the gun with him at that time.

On cross-examination, Ms. Jackson testified that Officer York chased the defendant and that three or four more officers arrived and began looking for him. She said that she did not know how long the police looked for the defendant and that she did not know if they came back and looked for him the next day. She said she did not remember testifying at the defendant's preliminary hearing.

Chattanooga Police Officer Stephen York testified that he was dispatched to Gillespie Road on May 15. He said he arrived at Andrea Jackson's house and saw her and the defendant in the yard. He said that the defendant was holding a shotgun and that Ms. Jackson was holding a dog. He said that the defendant was pointing the gun at Ms. Jackson and that when he got out of his patrol car, the defendant ran. He said that he and seven to ten other officers looked for the defendant for at least one hour. He said he did not look for the gun and acknowledged that he had had no reason to believe the defendant dropped it.

Erica Tucker testified that at the time of trial, she was in the third grade. She said that on May 28, 1999, she lived at 1004 Gillespie Road and that she and her cousin, Desiree Davis, decided to build a tree house in the backyard. She said that her backyard was full of trees and that she and Desiree found a gun. She said that the gun had black tape on it and that they thought it was a water gun. She said that Desiree's brother, Michael Hicks, tried to take the gun away from them, that the gun fired, and that she was shot. The state showed the gun to her, and she indicated that the hammer was pulled back when she and Desiree found it. She said that as a result of the shooting, she had to wear a leg brace and that she probably would have to wear the brace for the rest of her life. She said that she still had shotgun pellets in her head and that she had memory problems. On cross-examination, she said that she played in the woods behind her house almost everyday but that she

had never seen the gun before May 28. The defense asked her how she knew the gun was cocked, and she said, "I seen the part of it. My momma told me, you know." She said that no one from the prosecutor's office told her that the gun had been cocked.

Reginald Johnson, Erica's stepfather, testified that on May 28, 1999, Erica and Desiree awoke about 8:00 a.m. They ate cereal and watched television while he washed clothes. About 11:30 a.m., Erica asked Mr. Johnson if she and Desiree could build a clubhouse, and he told her no. He said that Erica kept pestering him about the clubhouse and that he told her he would help her build it later. He said that the girls went outside and that Michael Hicks asked where Erica and Desiree were. He said he told Michael that the girls should be in the front yard because they were not supposed to play in the woods. Mr. Johnson sent Michael to find the girls and have them come inside for lunch. He heard a gunshot, had a feeling that something was wrong, and went outside. Michael was hysterical and told Mr. Johnson that he had shot Erica and Desiree. Mr. Johnson said that the girls were lying in the woods about fifty feet from the house and that there was nothing he could do to help Desiree.

Brian Tucker, Erica Tucker's brother, testified that at the time of trial, he was fourteen years old. He said that on May 15, 1999, he and some other people were at Andrea Jackson's house for a barbecue. He said that the defendant showed up uninvited, left, and returned about two hours later. He said the defendant had a gun under a white towel and began arguing with Danny Jones about a dog. He said Mr. Jones took the gun away from the defendant and unloaded it. He said the defendant reached into his pocket, pulled out more shells, reloaded the weapon, and pointed the gun at Ms. Jackson because Ms. Jackson was about to let a dog attack the defendant. He said that the police arrived, that the defendant ran up a hill, and that the police chased the defendant. He said that the defendant's gun had tape on its handle but that he did not know if the gun was cocked. He said that on May 28, he was at Andrea Jackson's house and heard a loud noise and screaming. He said he rode his bike home and saw Michael Hicks crying in the yard. He said he ran into the backyard and saw Erica and Desiree lying on the ground. He said that he also saw a gun on the ground and that it was the same gun he had seen on May 15. He said that when the police arrived, he told them where the gun was but that he did not tell them about the incident at Andrea Jackson's house on May 15.

On cross-examination, Brian Tucker testified that he gave a statement to Sergeant Dan Moody. He said that in the statement, he described the gun as four feet long. At trial, he acknowledged that the gun was about two feet long. He said that he did not see police officers looking for the gun on May 15 and that no officers went into the woods.

Angela Tucker, Erica Tucker's mother, testified that on May 28, 1999, she was at work and received a telephone call about 12:20 p.m. Ms. Tucker went to the hospital and learned that Desiree was dead and that Erica was in critical condition. Doctors told Ms. Tucker that about thirty shotgun pellets had entered the left side of Erica's brain and that Erica was in a coma. Three weeks after the shooting, Erica was moved to Sisken Hospital and regained consciousness. As a result of the

shooting, Erica had to relearn to crawl, walk, and hold her head up. Ms. Tucker also had to teach Erica how to feed herself and go to the bathroom.

Chattanooga Police Sergeant Dan Moody testified that he went to 1004 Gillespie on May 28. He said that Desiree and Erica had been removed from the scene and that he collected a shotgun from an overgrown wooded area behind the house. He said that the gun had tape on it, that he sent the gun to the Alcohol, Tobacco, and Firearms (ATF) laboratory for fingerprint testing, that the laboratory removed the tape, and that no identifiable fingerprints were found on the gun. He said that the gun was a single-action weapon and that its hammer had to be pulled back and the trigger pulled in order for it to fire. He acknowledged that it took more force to cock the gun than it did to pull the trigger. He said that crime scene technicians removed a shell from the gun and that the shell contained small pellets. The state showed Sergeant Moody the shotgun shells that Danny Jackson gave to the police on May 15, and he said they were exactly the same as the shell that police removed from the shotgun on May 28. On cross-examination, Sergeant Moody acknowledged that fingerprints were recovered from the tape that was on the gun.

Dr. Frank King, the Hamilton County Medical Examiner, testified that he performed Desiree Davis's autopsy. The victim died of a shotgun wound to the head and chest. She had small-shot pellets in the right side of her face, across the front of her face, and in her left shoulder and upper left chest. She suffered fractures to both cheek bones, her right jaw, and her upper teeth, and blood aspired into her lungs. He said that stipple indicated the gun was one to two feet away from the victim when it was fired. Blood loss, blunt impact to the victim's head, and aspiration of blood caused her death. On cross-examination, he said the direction of the gunshot was from right to left and downward into the victim's left chest.

Michael Hicks, Desiree Davis's brother, testified that on May 28, he, Erica, and Desiree were going to build a treehouse. He said that Desiree and Erica found a gun in the woods behind Erica's house and that he tried to take it away from them. He said that the girls let go of the gun, that he fell backward, and that the gun fired. On cross-examination, he said the gun was "sort of" pointed upward when it went off.

Larry Hankerson, an ATF fingerprint specialist, testified that he received a shotgun at the ATF laboratory, removed tape from gun's butt and handle, and tested the gun and tape for fingerprints. He said that he found no prints on the gun but that he found fingerprints on the adhesive side of the tape. He said the fingerprints on the tape did not match the defendant. He said that if the gun had been left outside for two weeks, the weather could have made it more difficult to recover fingerprints from it.

Valorie Denise Simmons testified for the defense that the defendant is her son's father. She said that on May 15, she, her son, and her daughter picked up the defendant at the defendant's mother's house. She said that her son kept saying he had found his puppy and that they turned onto Gillespie Road. She said that they pulled up to Andrea Jackson's house and that people and dogs were in the front yard. She said that the defendant got out of the car and told the people his name.

She said that the defendant stated he did not come to start trouble but that he wanted to see if the puppy in the yard was his. She said that a woman was holding a dog, cursing, and calling her and her daughter names. She said that the defendant talked to a man in a wheelchair and that the woman tried to unhook a chained dog in order for it to attack the defendant. She said that she told the defendant, "Come on, let's go" and that she drove him back to his mother's house. She said she suggested to the defendant that he get the puppy's ownership papers and telephone the police. On cross-examination, she said she did not know what the defendant did after she took him to his mother's house. She acknowledged having a prior conviction for smuggling marijuana into a jail.

Tracy Goodwin, the defendant's eleven-year-old son, testified that the defendant gave him a pit bull puppy and that someone stole the dog. He said he thought he saw the puppy and that on May 15, the defendant went to Andrea Jackson's house in order to see if the dog was there. He said that he waited in the car while the defendant talked to a man in a wheelchair, that a woman and four dogs were in the yard, and that the dogs did not do anything when the defendant went into the yard. On cross-examination, he said that the defendant was not mad when the defendant got back into the car. The state showed him the shotgun that was recovered on May 28, and he said he had never seen it before. He said that when they left Andrea Jackson's house, the defendant was going to get the ownership papers for the puppy.

Although the defendant had been charged with aggravated assault with a deadly weapon against Danny Jones and Andrea Jackson, the jury convicted him of two counts of reckless aggravated assault. In addition, the jury convicted the defendant of reckless endangerment and criminally negligent homicide.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support the convictions. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Reckless Aggravated Assault

The defendant claims that the evidence is insufficient to support his reckless aggravated assault convictions against Danny Jones and Andrea Jackson. He contends that if he pointed the gun at them, he did so in order to protect himself from the vicious dogs that were in Ms. Jackson's yard.

In addition, he contends that the evidence is insufficient because he did not shoot at Mr. Jones or Ms. Jackson and because they sustained no injuries.

As charged in the indictment, Class C aggravated assault is committed when a person intentionally or knowingly causes another reasonably to fear imminent bodily injury while using or displaying a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2); -102(a)(1)(B). The jury chose to convict the defendant of the lesser included offense of reckless aggravated assault. See Tenn. Code Ann. § 39-13-102(a)(2)(B).

Viewed in the light most favorable to the state, the evidence is sufficient to support the convictions. The defendant arrived at Ms. Jackson's house on May 15 and demanded that she give him a puppy he believed belonged to him. Ms. Jackson testified that when Mr. Jones told the defendant to bring proof that he owned the dog, the defendant said that he would return and that "things ain't going to be right." The defendant came back about two hours later with a gun wrapped in a towel, and Ms. Jackson telephoned 9-1-1. Mr. Jones testified that the defendant pointed the gun at him and Ms. Jackson, that the defendant threatened to shoot Ms. Jackson, and that he thought the defendant was going to shoot them. Ms. Jackson also testified that the defendant pointed the gun at her and threatened to shoot her. Although Ms. Jackson never testified that she was afraid of the defendant's actions, we believe that a rational jury could infer that Ms. Jackson's telephoning 9-1-1 after the defendant had stated "things ain't going to be right" and returned with the shotgun resulted from her fear of imminent bodily injury. See State v. James Albert Adams, No. M1998-00468-CCA-R3-CD, Davidson County (Tenn. Crim. App. Dec. 15, 1999) (inferring the victim's fear from the circumstances of the offense even though she did not testify that she was afraid). We note that the indictment alleged the defendant committed aggravated assault by intentionally or knowingly causing Mr. Jones and Ms. Jackson reasonably to fear imminent bodily injury while using or displaying a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(B). Therefore, bodily injury was not required in order for the jury to convict the defendant of reckless aggravated assault as a lesser included offense of aggravated assault as charged in the indictment. The evidence is sufficient.

## B. Reckless Endangerment

The defendant contends that the evidence is insufficient to support his reckless endangerment conviction. He contends that the fact that the children found the gun nearly two weeks after he left it in the woods defeats the requirement that the danger of death or serious bodily injury be imminent. In support of his argument, he cites State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999), in which our supreme court stated that in order "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." He contends that the unusual sequence of events in this case was so improbable that it could not be foreseen by a reasonable person. We disagree.

-7-

Class E felony reckless endangerment is recklessly engaging in "conduct which places or may place another in imminent danger of death or serious bodily injury" and is committed with a deadly weapon. Tenn. Code Ann. § 39-13-103(a)-(b).

> 'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-106(a)(31). In order to convict a defendant of reckless endangerment, "the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed." Payne, 7 S.W.3d at 28.

In this case, the defendant escaped from the police on May 15 by running from the Gillespie Road neighborhood into the nearby woods. There, he abandoned the shotgun, which he knew was cocked and loaded. No evidence was presented that children were present in the woods when the defendant dropped the gun. Nevertheless, given the close proximity of the woods to the neighborhood, the defendant consciously disregarded the fact that leaving the gun in the woods may place people in imminent danger of death or serious bodily injury. See Tenn. Code Ann. § 39-13-103(a); see, e.g., State v. Baggett, 836 S.W.2d 593, 596 (Tenn. Crim. App. 1992) (holding reckless endangerment proven because defendant's leaving drunk and unconscious victim in roadway at night created substantial and unjustifiable risk that victim would be struck by a car). Once the children walked into the area where the gun was located, i.e., the "zone of danger," the fact that the gun was cocked and loaded created a reasonable probability of death or serious bodily injury. Moreover, the children did not have to find and handle the gun in order to create a probability that someone would suffer death or serious bodily injury from it. In light of the gun's precarious state, anyone who accidentally stepped on it could have caused it to fire. We believe that a rational jury could have found that the defendant consciously disregarded a substantial and unjustifiable risk by leaving a cocked and loaded shotgun in woods adjacent to a neighborhood. Moreover, the defendant's actions constituted a gross deviation from the standard of care that an ordinary person would have exercised. The evidence is sufficient to support the defendant's conviction for reckless endangerment.

## C. Criminally Negligent Homicide

The defendant claims that the evidence is insufficient to support his criminally negligent homicide conviction because the state failed to prove that he acted with the required culpable mental state. First, he contends that the state did not establish that he should have been aware that his actions would create a substantial and unjustifiable risk because he dropped the gun in overgrown woods, a place where he had never been before and where children were not expected to play.

Second, he contends that his failure to perceive the risk did not constitute a gross deviation from the standard of care that an ordinary person would exercise under the circumstances because if he left the gun in the woods, he did so with the intent that it never be found. Finally, he contends that the girls' picking up the gun and Michael Hicks' trying to take it away from them was the proximate cause of Desiree Davis's death, not his leaving it in the woods. The state argues that the evidence is sufficient because the defendant should have known that his leaving a cocked and loaded shotgun in the woods had the potential to injure someone.

One is guilty of criminally negligent homicide if he or she engages in criminally negligent conduct which results in death. Tenn. Code Ann. § 39-13-212(a). The death of the victim must be the direct and proximate result of the defendant's criminal negligence. State v. Adams, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995). Tenn. Code Ann. § 39-11-302(d) defines criminal negligence as follows:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding the person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

"In other words, the accused must know, or should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." Adams, 916 S.W.2d at 474.

Initially, we note that in the previous section, we determined that the evidence is sufficient to show that the defendant acted recklessly when he dropped the gun in the woods. Thus, the evidence also is sufficient to show that he acted with criminal negligence. See Tenn. Code Ann. § 39-11-301(a)(2). Nevertheless, if recklessness had not been established, we believe the evidence still would be sufficient to show criminal negligence.

Mr. Jones testified that when he saw the defendant holding the shotgun on May 15, the gun was cocked. Moreover, Mr. Jones testified that although he unloaded the shotgun, the defendant took it from him and reloaded it. Erica Tucker said that the hammer was pulled back when she and Desiree found the gun. Sergeant Moody testified that in order for the weapon to fire, its hammer had to be pulled back and the trigger pulled. He also stated that it would take more force to pull back the hammer than it would to pull the trigger. In light of the evidence, we believe the proof established that the gun was cocked, loaded, and ready to fire when the defendant left it in the woods. Moreover, there was no evidence that the defendant accidentally dropped the gun as he was running from the police. To the contrary, the defendant's brief claims that if he left the gun in the woods, he did so intentionally in order to hide it.

Reginald Johnson's testimony established that the girls found the gun in the woods only fifty feet behind his house. The defendant, who had been in the neighborhood two weeks before the shooting, knew that he was leaving the gun near a residential area. He also knew that children were in the area because Ms. Jackson's children and other children from the neighborhood were present during the defendant's assault of Mr. Jones and Ms. Jackson on May 15. We believe the evidence justifies a conclusion that the defendant ought to have been aware of the risk created by leaving a cocked and loaded shotgun, which is highly dangerous, in overgrown woods only fifty feet away from a home. Because his leaving the shotgun near Erica Tucker's home set into motion the chain of events that resulted in the shooting, his actions were the proximate cause of Desiree Davis's death. See State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982) (providing that in order to convict the defendant of homicide, the state does not have to prove that the defendant's actions were the sole or immediate cause of the victim's death but that his actions contributed to the victim's death). We conclude that the evidence is sufficient to support the criminally negligent homicide conviction.

## II. MOTION TO SEVER

The defendant contends that the trial court erred by refusing to sever his aggravated assault offenses from his reckless endangerment and criminally negligent homicide offenses. He argues that he should have been tried separately for the aggravated assault charges because the jury's sympathy for the children prevented him from receiving a fair trial as to those crimes. The state claims that the trial court properly denied the defendant's motion because the offenses were part of the same criminal transaction and because evidence about the shooting on May 28 would have been admissible in the defendant's trial for the aggravated assaults he committed on May 15. We hold that the trial court should have granted the defendant's motion to sever but that the error was harmless.

Before trial, the state filed a motion to consolidate the defendant's four charges, and the defense filed a motion to sever the two aggravated assault charges from the reckless endangerment and criminally negligent homicide charges. In a pretrial hearing, the defense argued that the defendant could not get a fair trial if the "tragic incident" on May 28 was tried with the offenses that occurred on May 15. The defense proposed that the defendant be tried for the two aggravated assaults first and then tried for reckless endangerment and criminally negligent homicide in a separate proceeding. The trial court held that pursuant to Tenn. R. Crim. P. 8(a), it was required to join the offenses because they arose from the same criminal episode. As to the defense's motion to sever pursuant to Tenn. R. Crim. P. 14, the trial court determined that severance was not necessary because the jury could distinguish the May 15 offenses from the May 28 offenses.

Offenses based upon the same conduct or arising from the same criminal episode must be joined for the same trial. Tenn. R. Crim. P. 8(a). A severance of such offenses shall be granted (1) before trial if it is deemed appropriate to promote a fair determination of the defendant's guilt or lack thereof or (2) during trial if it is deemed necessary to achieve such a fair determination. Tenn. R. Crim. P. 14(b)(2)(i), (ii). The issue includes consideration of the number of offenses, the complexity

of the evidence, and the difficulty with which the jury would be able to distinguish the evidence and apply the law as to each offense. Whether or not to grant a severance rests within the sound discretion of the trial court. State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982). Because the trial court's decision regarding consolidation is determined from the evidence presented at the hearing, "appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000). The test is whether or not the defendant was clearly prejudiced in his defense by the joint trial. Id.

Although the defendant does not contest it, we question whether the four offenses were part of the same criminal episode. The shooting on May 28 occurred almost two weeks after the aggravated assaults. Moreover, the May 28 incident involved different victims and resulted in different crimes. In any event, even mandatorily joined offenses must be severed when "appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In this case, testimony about the defendant's pointing a cocked and loaded short-barrel shotgun at Mr. Jones and Ms. Jackson and running behind Ms. Jackson's house during his escape from the police was relevant to show that the same gun was found and accidentally fired by the children on May 28. Similarly, testimony about a short-barrel shotgun being found in the woods on May 28 was relevant to corroborate Mr. Jones' and Ms. Jackson's testimony that the defendant used the gun to assault them on May 15. However, testimony about the children being accidentally killed or injured by the weapon was not relevant to the assaults and was potentially prejudicial to the those cases. Therefore, we believe the trial court should have granted the defendant's motion to sever the aggravated assault crimes from the reckless endangerment and criminally negligent homicide crimes.

Nevertheless, we conclude that the defendant has failed to demonstrate that he was actually prejudiced by the trial court's refusing to sever the offenses. Reversal requires that the error involved a substantial right and more probably than not affected the result. See T.R.A.P. 36(b). The defense was primarily based upon the issue of whether or not the defendant could be held criminally responsible for Desiree Davis's death and whether or not he committed reckless endangerment against the other children. His approaching and threatening Danny Jones and Andrea Jackson with the shotgun were not seriously contested. We note that although two witnesses testified on the defendant's behalf, neither offered any proof as to what happened when the defendant returned to Andrea Jackson's house on May 15 or to contradict the state's witnesses, who consistently testified that the defendant returned and threatened Ms. Jackson and Mr. Jones with the shotgun. We also note that although the defendant was charged with Class C felony aggravated assault, the jury convicted him of the lesser included offense of reckless aggravated assault, a Class D felony. We conclude that the verdicts were not affected by the failure to sever the offenses.

### III. DOUBLE JEOPARDY

The defendant claims that his convictions for reckless endangerment and criminally negligent homicide resulted from only one course of conduct and, therefore, that only one of the convictions

can be sustained. In support of his argument, he cites State v. Ramsey, 903 S.W.2d 709 (Tenn. Crim. App. 1995), in which this court held that the statute defining reckless endangerment prohibits a course of conduct as opposed to an individual act or result and, therefore, that a single period of reckless driving typically constitutes a single offense even though the driver endangered more than one person. Id. at 713. The state claims that the convictions should not be merged. We agree with the state.

The double jeopardy clauses of both the United States and Tennessee Constitutions state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969); State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). It is the last protection that is of interest in this case.

In Denton, our supreme court set forth the procedure for analyzing a claim that two offenses are the same for double jeopardy purposes. It stated that the resolution of a double jeopardy punishment issue under the Tennessee Constitution requires the following four steps: (1) an analysis of the two statutes in question, (2) an analysis of the evidence needed to prove the two offenses, (3) a consideration of the number of victims and discrete acts, and (4) a comparison of the purposes behind the two statutes. 938 S.W.2d at 379-81. These steps are weighed as they relate to each other with none being determinative. Id. at 381.

The analysis of the two statutory provisions is directed by the test articulated in Blockburger v. United States:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact that the other does not.

284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932). As noted earlier, criminally negligent homicide is defined as criminally negligent conduct which results in death, whereas Class E felony reckless endangerment occurs when a person recklessly engages in conduct that places or may place another in imminent danger of death or serious bodily injury and uses a deadly weapon. Tenn. Code Ann. §§ 39-13-212(a), -103. Criminally negligent homicide requires a death but reckless endangerment does not. Moreover, Class E felony reckless endangerment requires the use of a deadly weapon, but criminally negligent homicide does not. Thus, this step indicates that the legislature intended that a defendant could be convicted of both criminally negligent homicide and Class E felony reckless endangerment for the same set of facts.

Regarding step two, our supreme court in Duchac v. State examined the evidence required by the two statutory provisions to determine whether multiple punishments could stand:

> "One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by statutes. . . . [T]here is no identity of offenses if on the trial of one offense proof of some fact is required that is not necessary to be proved in the trial of the other, although some of the same acts may necessarily be proved in the trial of each."

505 S.W.2d 237, 239 (Tenn. 1973) (quoting Am. Jur. 2d Criminal Law, § 82). In order to prove that the defendant committed criminally negligent homicide, the state had to show that a death resulted from the defendant's conduct. In contrast, for the reckless endangerment conviction, the state had to show that an individual or class of persons entered the zone of danger and that the defendant's conduct placed them in an imminent danger of death or serious bodily injury. Thus, dual convictions would not violate constitutional prohibitions against double jeopardy because different evidence was used to prove each offense.

The third step of the double jeopardy analysis looks to the number of victims or discrete acts. When there exists only one victim, multiple convictions generally are not justified. See Denton, 938 S.W.2d at 381. "Discrete acts can justify multiple convictions." Id.; see State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996) (holding evidence of three discrete penetrations supported three aggravated rape convictions). In this case, Desiree Davis was the victim of the criminally negligent homicide, and Erica Tucker's and Michael Hicks' entering the zone of danger gave rise to the reckless endangerment charge. In addition, the gun accidentally firing and killing Desiree Davis was relied upon to prove criminally negligent homicide while Erica's and Michael's walking into the zone of danger was relied upon to prove reckless endangerment. Therefore, different victims and discrete acts indicates that the two offenses should not be considered one for double jeopardy purposes.

The final step in the double jeopardy analysis is to consider the purposes behind the two statutes involved. Denton, 938 S.W.2d at 381. Both reckless endangerment and criminally negligent homicide protect people. Thus, application of the fourth factor tends to demonstrate that double jeopardy should bar convictions for both offenses.

After considering these four steps as they relate to each other, we believe that the defendant's convictions for both reckless endangerment and criminally negligent homicide do not violate the principles of double jeopardy. The statutes are distinct under Blockburger, the state used different evidence to prove the offenses, and the offenses have separate victims. We hold that the finding of

guilt for the felony reckless endangerment conviction does not merge into the criminally negligent homicide conviction.[1]

## IV. SENTENCING

Finally, the defendant contends that his sentences are excessive. Specifically, he argues that the facts did not justify the trial court sentencing him to the maximum punishments within the range for his convictions and ordering him to serve his reckless endangerment and criminally negligent homicide sentences consecutively to his reckless aggravated assault sentences. The state claims that the defendant's sentences are not excessive. We agree with the state.

At the sentencing hearing, Robin Berkhart, Desiree Davis's and Michael Hicks' mother, testified that Michael had been very close to Desiree and that he had emotional problems as a result of the shooting. Since the shooting, her family has had to move three or four times and Michael has had legal trouble as a juvenile. Ms. Berkhart said that she would never get to see Desiree grow up, marry, and have children and that the defendant was negligent for leaving the gun in the woods.

Angela Tucker, Erica Tucker's mother, testified that her family would have to live with the results of the shooting for the rest of their lives and that it had torn the family apart. She said that Erica may never be able to live on her own. She said that she had to tell Erica how to do things that an eleven-year-old girl should know how to do and that Erica constantly had to be reminded of things because her memory was poor. Erica has difficulty walking and gets physical therapy at school. Although Erica was an exceptionally bright student before the shooting, at the time of the hearing, she was reading at a first grade level.

The defendant read a statement that he had written. In the statement, the defendant apologized to the children and their families. He said that the shooting was not Michael Hicks' fault and that he wished he could help Michael get over it. He said that he loved children and that he would trade places with Desiree if he could. He said that he would never intentionally hurt anyone, that he and his mother were in pain for the victims and their families, and that he prayed God would forgive him. On cross-examination, the defendant stated that he did not drop the gun in the woods, that the shooting was not his fault, and that he did not commit aggravated assault against Danny Jones and Andrea Jackson. He said that he was not claiming he was innocent but that he was not guilty of all the charges. He said that he told his attorneys at trial not to cross-examine the children or their mothers because they had not done anything wrong.

According to the presentence report, the then thirty-four-year-old defendant is not married and has four children. The report reflects that the defendant dropped out of high school in the eleventh grade, has not had a job since 1988, and has never served in the military. The report shows that he has many prior convictions, including three for robbery, one for felony escape, two for

---

[1]We need not decide if both the criminally negligent homicide and reckless endangerment convictions could be sustained if Desiree Davis had been the only child to enter the woods on May 28.

misdemeanor assault, and one for misdemeanor escape. In addition, the state introduced certified copies of judgments which show that the defendant has a second felony escape conviction and two felony convictions for receiving stolen property.

The trial court classified the defendant as a Range III offender based upon his prior felony convictions. See Tenn. Code Ann. § 40-35-107(a)(1). The trial court noted that the defendant's presumptive sentence for the reckless aggravated assault convictions was eight years, the minimum in the range for a Class D felony, and four years for the reckless endangerment and criminally negligent homicide convictions, the minimum in the range for a Class E felony. See Tenn. Code Ann. §§ 40-35-112(c)(4), (5), -210(c). The trial court determined that enhancement factor (1), that the defendant has a prior history of criminal behavior in addition to that necessary to establish the appropriate range, applied to his sentences for all four convictions. See Tenn. Code Ann. § 40-35-114(1) (Supp. 2001) (amended 2002).[2] In addition, the trial court applied enhancement factor (6), that the injuries inflicted on the victim were particularly great, to his reckless endangerment conviction. See Tenn. Code Ann. § 40-35-114(6). Finally, it applied enhancement factors (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, and factor (16), that the crime was committed under circumstances in which the potential for bodily injury to the victim was great, to his reckless aggravated assault sentences because people other than the victims were present during the crimes. See Tenn. Code Ann. § 40-35-114(10), (16).

The trial court also determined that mitigating factor (11), that the defendant committed the crime under such unusual circumstances that it is unlikely he had a sustained intent to violate the law, applied to his reckless endangerment and criminally negligent homicide sentences. See Tenn. Code Ann. § 40-35-113(11). The trial court sentenced the defendant to the maximum in the range, twelve years, for each reckless aggravated assault conviction and ordered that he serve the sentences concurrently. See Tenn. Code Ann. § 40-35-112(c)(4). For the reckless endangerment and criminally negligent homicide convictions, the trial court stated that the enhancement factors outweighed the mitigating factor and sentenced the defendant to the maximum in the range, six years, for each conviction to be served concurrently. See Tenn. Code Ann. § 40-35-112(c)(5). The trial court held that the defendant's extensive criminal history and the fact that he is a dangerous offender justified his serving the effective six-year sentence consecutively to the effective twelve-year sentence. See Tenn. Code Ann. § 40-35-115(b)(2), (4).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing

---

[2]The legislature's 2002 amendment to Tenn. Code Ann. § 40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one.

Act, we may not disturb the sentence even if a different result were preferred.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.  T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

The sentence to be imposed by the trial court is presumptively the minimum in the range for Class D and E felonies unless there are enhancement factors present.  Tenn. Code Ann. § 40-35-210(c).  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors.  Tenn. Code Ann. § 40-35-210(d)-(e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

The defendant claims that the facts of the case do not justify an effective eighteen-year sentence.  Specifically, he contends that the trial court should not have sentenced him to twelve years for each of his reckless aggravated assault convictions because he did not shoot at or harm Danny Jones or Andrea Jackson and because he allowed Mr. Jones to unload the shotgun.  Regarding his sentences for the reckless endangerment and criminally negligent homicide convictions, he claims that "the injuries to the children and death of the child . . . led to maximizing both sentences and making them consecutive" to the effective twelve-year sentence.

We take the defendant's argument to be that the trial court failed to consider the unique facts of this case and that the trial court improperly weighed enhancement and mitigating factors. Although the defendant is not claiming that the trial court improperly applied enhancement or mitigating factors to his sentences, we note that enhancement factor (10), regarding no hesitation about committing a crime when the risk to human life was high, and factor (16), regarding great potential for bodily harm to the victim, were inapplicable to his reckless aggravated assault committed with a deadly weapon convictions because "there is necessarily a risk to human life and the great potential for bodily injury whenever a deadly weapon is used." State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Nevertheless, this court has held that when factor (10) is inherent in the offense relative to the victim, it still may apply if a person other than the victim was in the area of high risk. See State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1995). In this case, witnesses testified that people other than Mr. Jones and Ms. Jackson were present during the assaults. However, the state presented no proof that these people were standing near Mr. Jones or Ms. Jackson during the crimes or that the defendant's conduct endangered the life of anyone other than the victims. Thus, factor (10) is inapplicable. Unlike factor (10), enhancement factor (16) applies only when the defendant creates a great risk of injury to a victim. See State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002). Therefore, the fact that other people were present during the reckless aggravated assaults also does not support the trial court's application of factor (16).

In any event, we believe that application of enhancement factor (1) regarding the defendant's previous criminal history justifies the defendant's twelve-year sentences for the reckless aggravated assault convictions and his six-year sentences for the reckless endangerment and criminally negligent homicide convictions. Finally, the defendant has an extensive criminal history that justifies the trial court's ordering him to serve his effective twelve- and six-year sentences consecutively pursuant to Tenn. Code Ann. § 40-35-115(b)(2).

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE